## UNITED STATES COURT OF INTERNATIONAL TRADE

AMSTED RAIL COMPANY, INC.,
ASF-K DE MEXICO S. DE R.L. DE C.V.,
STRATO, INC., WABTEC CORP., and
TTX COMPANY,

     Plaintiffs,

  v.

UNITED STATES INTERNATIONAL
TRADE COMMISSION and ACTING
SECRETARY KATHERINE M. HINER,
in her official capacity,

     Defendants,

  and

COALITION OF FREIGHT RAIL
PRODUCERS,

     Defendant-Intervenor.

Before: Judge Gary S. Katzmann
Case No. 22-00307

### PLAINTIFFS' NOTIFICATION OF SUPPLEMENTAL AUTHORITY

  Pursuant to the Court's instructions during the November 9, 2022 hearing, Plaintiffs submit

as a Notification of Supplemental Authority the attached cases discussed at the hearing:

- *Unified Sewerage Agency, etc. v. Jelco Inc.*, 646 F.2d 1339 (9th Cir. 1981)

- *Uniloc 2017 LLC v. Apple Inc.*, 946 F3d 1351 (Fed. Cir. 2020)

- *Stone v. FDIC*, 179 F.3d 1368 (Fed. Cir. 1999)

Dated: November 9, 2022

Respectfully submitted,

/s/ Richard P. Ferrin

Andrew T. Schutz
Ned H. Marshak
GRUNFELD, DESIDERIO, LEBOWITZ,
SILVERMAN & KLESTADT LLP
599 Lexington Avenue, 36th Floor
New York, NY 10022
(212) 557-4000

*Counsel for Plaintiff*
*Strato, Inc.*

James M. Smith
Shara L. Aranoff
Sooan (Vivian) Choi
COVINGTON & BURLING LLP
One City Center
850 Tenth Street, NW
Washington, DC 20001
(202) 662-6000

*Counsel for Plaintiff*
*TTX Company*

Douglas J. Heffner
Brian P. Perryman
Richard P. Ferrin
Carolyn Bethea Connolly
FAEGRE DRINKER
BIDDLE & REATH LLP
1500 K Street, NW, Suite 1100
Washington, DC 20005
(202) 230-5000

*Counsel for Plaintiffs*
*Amsted Rail Company, Inc. and*
*ASF-K de Mexico S. de R.L. de C.V.*

David M. Morrell
Ryan M. Proctor
JONES DAY
51 Louisiana Avenue, NW
Washington, DC 20001
(202) 879-3636

*Counsel for Plaintiff Wabtec Corp.*

UNIFIED SEWERAGE AGENCY, ETC. v. JELCO INC.    **1339**

Cite as 646 F.2d 1339 (1981)

UNIFIED SEWERAGE AGENCY OF WASHINGTON COUNTY, OREGON, a municipal corporation and County Service District, on behalf of and for the use and benefit of Teeples & Thatcher Inc., a corporation, Plaintiffs-Appellees,

v.

JELCO INCORPORATED, a corporation, and Seaboard Surety Company, a corporation, Defendants-Appellants.

No. 78–1920.

United States Court of Appeals, Ninth Circuit.

Argued and Submitted May 15, 1980.

Decided June 1, 1981.

Concrete subcontractor brought suit against prime contractor, and prime contractor filed motion to disqualify concrete subcontractor's law firm on the theory that the law firm was suing its own client in violation of Canons of Code of Professional Responsibility. The United States District Court for the District of Oregon, James M. Burns, Chief Judge, denied motion, and prime contractor appealed. The Court of Appeals, Goodwin, Circuit Judge, held that: (1) appeal would be treated as a petition for mandamus; (2) Code does not create per se rule against dual representation in unrelated matters of clients with adverse interests; (3) district court did not abuse its discretion in denying motion of prime contractor to disqualify law firm, which represented concrete subcontractor and which had previously represented prime contractor in dispute with electrical subcontractor, where it was sufficiently obvious that law firm could adequately represent both prime contractor and concrete subcontractor, litigation in the two cases was quite different, individual contracts involved were quite different, and prime contractor was in a position to know all the risks it was taking in employing law firm; and (4) disqualification was not re-

quired by canon stating that attorney should avoid the appearance of impropriety.

Affirmed.

**1. Federal Courts ⬅553**

Denial of a motion to disqualify counsel is not an appealable order, but appeal from such order may be treated as petition for writ of mandamus depending upon whether party seeking writ has no other adequate means to attain relief desired, whether petitioner will be damaged or prejudiced in a way not correctable on appeal, whether order is clearly erroneous as a matter of law, whether order is an oft-repeated error or manifestly persistent disregard of the federal rules, and whether order raises new and important problems or issues of law on first impression.

**2. Mandamus ⬅1**

Although denial of motion to disqualify counsel was not appealable, appeal would be treated as a petition for writ of mandamus, where defendant had no other adequate means of seeking relief, defendant could suffer irremediable damage if forced to wait until after trial to appeal, where public perception of profession could be damaged, where case involved question of law, and where record had not previously addressed the important issues raised in the case. 28 U.S.C.A. §§ 1292(b), 1651; Or. Code of Professional Responsibility, Canon 4.

**3. Attorney and Client ⬅21**

Under canon prohibiting an attorney from divulging confidences and secrets of a client, an attorney may not represent interests adverse to a former client if the factual context of the later representation is similar or related to that of the former representation. Or. Code of Professional Responsibility, Canon 4.

**4. Attorney and Client ⬅20**

Canon of ethics governing representation adverse to a present client implies if

attorney simultaneously represents clients with differing interests, even if representation ceases prior to filing of motion to disqualify, for if this were not the case, the challenged attorney could always convert a present client into a "former client" by choosing when to cease to represent the disfavored client. Or. Code of Professional Responsibility, Canon 5.

**5. Attorney and Client ⟸20**

In contrast to representation undertaken adverse to a former client, representation adverse to a present client must be measured not so much against similarity in litigation as against duty of undivided loyalty which an attorney owes to each of his clients. Or. Code of Professional Responsibility, Canons 4, 5; DR5–105(B).

**6. Attorney and Client ⟸20**

Under disciplinary rule providing that attorney shall not continue multiple employment if exercise of his independent professional judgment in behalf of a client will be or is likely to be adversely affected by his representation of another client, specific adverse effect need not be demonstrated to trigger rule if an attorney undertakes to represent a client whose position is adverse to that of a present client; however, attorney may avoid disqualification under rule by satisfying other rule's conditions that each client must consent to multiple representation after full disclosure of the risks and that it must be obvious that attorney can adequately represent the interests of each client. Or. Code of Professional Responsibility, DR5–105(B, C).

**7. Attorney and Client ⟸20**

District court did not clearly err in finding that defendant, prime contractor, made informed and knowing waiver of any conflict or apparent conflict arising out of law firm's representation of defendant in dispute with electrical subcontractor and law firm's representation of concrete subcontractor in dispute with defendant in view of evidence that defendant knew from

the beginning that law firm represented concrete subcontractor in a long-standing client relationship, that concrete subcontractor was involved in an embryonic dispute with defendant, and that law firm would accept defendant as a client only if that relationship would not inhibit law firm in continuing to act as counsel for concrete subcontractor. Or. Code of Professional Responsibility, DR5–105(C).

**8. Estoppel ⟸55**

Where defendant, a prime contractor, had effectively consented to law firm's representation of concrete subcontractor at the same time law firm was representing defendant in dispute with electrical subcontractor despite existence of embryonic dispute between defendant and concrete subcontractor, defendant was estopped from revoking its consent to law firm's representation of concrete subcontractor by reliance of everyone on defendant's long-standing position.

**9. Attorney and Client ⟸20**

To avoid disqualification under disciplinary rule governing multiple employment, attorney's mere showing of consent of client after full disclosure is insufficient; it must be "obvious" that attorney can adequately represent interest of each client. Or. Code of Professional Responsibility, DR5–105(B, C).

**10. Attorney and Client ⟸20**

Under disciplinary rule providing that attorney can avoid disqualification under rule governing multiple employment by showing that each client consented to multiple representation after full disclosure of the risks and by showing that it is "obvious" that attorney can adequately represent the interests of each client, the term "obvious" refers to an objective standard under which ability of attorney adequately to represent each client is free from substantial doubt. Or. Code of Professional Responsibility, DR5–105(B, C).

See publication Words and Phrases for other judicial constructions and definitions.

**11. Attorney and Client** ⬤⟳20

Code of Professional Responsibility does not create per se rule against dual representation in unrelated matters of clients with adverse interests; while practice of suing a client can be neither condoned nor encouraged, client is not required to forego in all circumstances his choice of a particular attorney merely because there is foreseeability of future conflict with one of the attorney's existing clients, as Code strikes a balance on the side of an individual's right to choose his own counsel and against a per se rule forbidding multiple representation. Or. Code of Professional Responsibility, Canon 5; DR5–105(B, C).

**12. Attorney and Client** ⬤⟳20

In determining whether it is obvious that an attorney can represent adverse parties, court should look at factors such as nature of the litigation, type of information to which the lawyer may have had access, whether client is in a position to protect his interests or know whether he will be vulnerable to disadvantage as a result of the multiple representation, the questions in dispute, e. g., whether dispute involves statutory construction versus factual constructions, and whether government body is involved. Or. Code of Professional Responsibility, DR5–105(B, C).

**13. Attorney and Client** ⬤⟳20

On prime contractor's motion to disqualify concrete subcontractor's law firm, district court did not clearly err in finding that there was no substantial or close relationship between subject matter of litigation between prime contractor and electrical subcontractor and the subject matter of litigation between concrete subcontractor and prime contractor and that there was no evidence to justify finding that law firm representing both concrete subcontractor and prime contractor had any special insight or advantage arising on account of its representation of prime contractor in case involving electrical subcontractor which would have given concrete subcontractor

any unfair advantage over prime contractor. Fed.Rules Civ.Proc. Rule 52(a), 28 U.S.C.A.; Or. Code of Professional Responsibility, DR5–105(B, C).

**14. Attorney and Client** ⬤⟳21

District court did not abuse its discretion in denying motion of defendant, a prime contractor, to disqualify law firm which represented plaintiff concrete subcontractor and which had previously represented prime contractor in dispute with electrical subcontractor, where it was sufficiently obvious that law firm could adequately represent both prime contractor and concrete subcontractor, litigation in the two cases was quite different, and prime contractor was in a position to know all the risks it was taking. Or. Code of Professional Responsibility, Canon 5; DR5–105(B, C).

**15. Attorney and Client** ⬤⟳32

Appropriate standard for reviewing district court's ruling on a motion for attorney disqualification is whether ruling was an abuse of discretion; rationale is that primary responsibility for controlling conduct of lawyers practicing before the district court lies with that court, not with court of appeals.

**16. Attorney and Client** ⬤⟳20

Canon concerning avoiding the appearance of impropriety was not intended to override delicate balance created by canon governing multiple representation. Or. Code of Professional Responsibility, Canons 5, 9.

**17. Attorney and Client** ⬤⟳20

Where prime contractor validly consented after full disclosure to representation by law firm in litigation with electrical subcontractor knowing that law firm had a long-standing attorney-client relationship with concrete subcontractor, which, represented by law firm, subsequently sued prime contractor, and record indicated that law firm could adequately represent both parties and denial of motion to disqualify

under canon governing multiple representation was not an abuse of discretion, disqualification of law firm in suit brought against prime contractor by concrete subcontractor was not required by canon stating that attorney should avoid the appearance of impropriety. Or. Code of Professional Responsibility, Canons 5, 9; DR5–105(B, C).

———

Robert D. Maack, Salt Lake City, Utah, argued for defendants-appellants; Wayne Wadsworth, Watkiss & Campbell, Salt Lake City, Utah, Lindsay, Hart, Neil & Weigler, Portland, Or., on brief.

Dwight L. Schwab, Schwab, Burdick & Hilton, Daniel J. Seifer, Portland, Or., for plaintiffs-appellees.

Appeal from the United States District Court for the District of Oregon.

Before GOODWIN, FLETCHER and PREGERSON, Circuit Judges.

GOODWIN, Circuit Judge.

Jelco moved to disqualify the plaintiff's law firm on the theory that the attorneys

were suing their own client in violation of Canons 4, 5 and 9 of the Code of Professional Responsibility of the State of Oregon (1980).[1] The trial judge denied the disqualification motion and Jelco appealed.

We treat the appeal as a petition for mandamus.

Jelco, based in Salt Lake City, was the prime contractor on a sewer plant project in Oregon. Teeples & Thatcher was the subcontractor for concrete work, and Ace Electric Co. was an electrical subcontractor. Kobin & Meyer is a Portland law firm experienced in representing construction companies. Kobin & Meyer had represented Teeples & Thatcher for ten years prior to this litigation.

In 1975, a dispute arose between Ace Electric and Jelco over Ace's claim for additional compensation under its subcontract. Ace contended that a change Jelco made in suppliers constituted a change in the terms of the subcontract. Jelco's Salt Lake City counsel, one Beesley, and another Jelco agent contacted Paul Meyer of Kobin &

---

1. *Cord v. Smith,* 338 F.2d 516 (9th Cir. 1964), *clarified,* 370 F.2d 418 (1966), involved an appeal from the denial of a motion to disqualify plaintiff's attorney. The court rejected the plaintiff's argument that state law applied. It said:

   "[W]e do not think that the rule of *Erie Railroad Co. v. Tompkins,* 1938, 304 U.S. 64, 58 S.Ct. 817, 82 L.Ed. 1188, compels the federal courts to permit, in proceedings before those courts, whatever action by an attorney-at-law may be sanctioned by the courts of the state. When an attorney appears before a federal court, he is acting as an officer of that court, and it is that court which must judge his conduct." 388 F.2d at 524.

   In this case, the United States District Court for the District of Oregon has adopted as its rules the disciplinary rules of the State Bar of Oregon. *See* Local Rule 3(d) of the District Court for the District of Oregon. Therefore, in deciding whether the district court properly denied Jelco's motion to disqualify the plaintiff's law firm, we must decide whether the district court properly applied the Code of Professional Responsibility adopted by the State Bar of Oregon. *See Chugach Elec. Ass'n v. U.S.D.C. for the District of Alaska,* 370 F.2d 441, 442 n.1 (9th Cir. 1966), *cert. denied,* 389 U.S. 820, 88 S.Ct. 40, 19 L.Ed.2d 71 (1967).

   We express no opinion on the law to apply where the district court has not designated the applicable rules of professional responsibility (*e. g.,* state law, the Model Code of Professional Responsibility, or a federal common law of professional responsibility).

   Canons 4, 5 and 9 of the Code of Professional Responsibility adopted by the Oregon State Bar, and the disciplinary rules pertaining to those canons, are identical to the canons and disciplinary rules contained in Canons 4, 5 and 9 of the American Bar Association's Model Code of Professional Responsibility (1980). Hence, our discussion refers to decisions from jurisdictions adopting Canons 4, 5 and 9 of the Model Rules and to ABA opinions.

   The reporter for the ABA Committee that drafted the Code of Professional Responsibility recently noted that the Code's Disciplinary Rules were drafted for use in disciplinary proceedings and were not intended to be used as rules governing disqualification motions. Sutton, *How Vulnerable is the Code of Professional Responsibility?,* 57 N.C.L.Rev. 497, 514–16 (1979). Nevertheless, the Code will continue to provide guidance to the courts in determining whether a case would be tainted by the participation of an attorney or firm as shown by the District of Oregon's Local Rule 3(d).

Meyer in mid-1975, and asked that firm to join in Jelco's representation in the Ace Electric controversy.

Meyer told Beesley that Kobin & Meyer represented Teeples & Thatcher in what was then an embryonic dispute between Teeples & Thatcher and Jelco. Teeples & Thatcher's expressions of dissatisfaction with Jelco's scheduling and sequence of concrete work had reached the stage of lawyer discussions. Beesley nonetheless recommended to Jelco management that Kobin & Meyer be retained to assist in the Ace Electric litigation. Jelco's management, with full knowledge of Jelco's potential conflict with Teeples & Thatcher on the same project, and with full knowledge of Kobin & Meyer's long-standing relationship with Teeples & Thatcher, retained Kobin & Meyer.

In mid-1976, after a proposed settlement of the Teeples-Jelco dispute collapsed, Meyer told Beesley that the Teeples-Jelco dispute could ripen into a lawsuit. Meyer asked Beesley, and through him, Jelco's management, to re-evaluate whether Jelco wished Kobin & Meyer to continue to represent Jelco in the Ace Electric litigation. Meyer made it clear that if it came to a choice, Kobin & Meyer preferred to keep Teeples as a client. Jelco, through Beesley, replied unequivocally that it desired Kobin & Meyer to continue as counsel in the Ace litigation regardless of what happened in the Jelco dispute with Teeples & Thatcher.

The liability issues in the Ace litigation were tried in July 1976, and were determined adversely to Jelco. In December 1976, Kobin & Meyer filed an action for Teeples & Thatcher against Jelco.

In March 1977, with the damages issue in the Ace litigation still to be tried, Meyer again asked Beesley and Jelco's house counsel if Jelco desired to have Kobin & Meyer continue to represent Jelco against Ace. Meyer repeated his firm's expressed desire to avoid prejudicing Kobin & Meyer's representation of Teeples. Jelco again decided to continue with Kobin & Meyer in the Ace litigation.

In May 1977, Jelco discharged Beesley, obtained new Salt Lake City counsel, and discharged Kobin & Meyer from the Ace Electric litigation as soon as a substitute attorney could take over that case. In December 1977, Jelco filed this motion to disqualify Kobin & Meyer from further representation of Teeples & Thatcher in the action against Jelco.

## I. JURISDICTION

[1] Denial of a motion to disqualify counsel is not an appealable order under the test set forth in *Cohen v. Beneficial Loan Corp.*, 337 U.S. 541, 69 S.Ct. 1221, 93 L.Ed. 1528 (1949). *Firestone Tire & Rubber Co. v. Risjord*, 449 U.S. ——, 101 S.Ct. 669, 66 L.Ed.2d 571 (1981); *Chugach Elec. Ass'n v. United States D. C. for Dist. of Alaska*, 370 F.2d 441 (9th Cir. 1966), *cert. denied*, 389 U.S. 820, 88 S.Ct. 40, 19 L.Ed.2d 71 (1967); *Cord v. Smith*, 338 F.2d 516, 521 (9th Cir. 1964), *clarified*, 370 F.2d 418 (1966). *See also, United States v. State of Wash.*, 573 F.2d 1121, 1122 (9th Cir. 1978) (order denying motion to disqualify a judge is not appealable).

From time to time, however, this circuit has treated an appeal from a nonappealable order as a petition for a writ of mandamus and has undertaken discretionary review under the All Writs Act, 28 U.S.C. § 1651 (1976). Whether we will do so in a particular case depends upon whether the order qualifies for extraordinary relief under the guidelines set forth in *Bauman v. United States Dist. Court*, 557 F.2d 650 (9th Cir. 1977). Those guidelines are:

" . . . (1) The party seeking the writ has no other adequate means, such as a direct appeal, to attain the relief he or she desires. . . . (2) The petitioner will be damaged or prejudiced in a way not correctable on appeal. . . . (3) The district court's order is clearly erroneous as a matter of law. . . . (4) The district court's order is an oft-repeated error, or manifests a persistent disregard of the federal rules. . . . (5) The district court's

order raises new and important problems, or issues of law of first impression. . . ." (Citations omitted) 557 F.2d at 654–55. The *Bauman* court emphasized that all factors would not be relevant in every case, and that the factors might point in different directions in any one case.

[2] Mandamus relief is appropriate here.[2] First, Jelco has no other adequate means of seeking relief. A denial of a motion to disqualify is not an appealable order, and this court has held that certification under 28 U.S.C. § 1292(b) is not available. *Trone v. Smith,* 553 F.2d 1207 (9th Cir. 1977). Second, Jelco could suffer irremediable damage if forced to wait until after trial to appeal. Any advantage Kobin & Meyer possesses as a result of its representation of Jelco could be put to use at trial. Information once used or exposed would not be forgotten and could be used against Jelco on retrial. More important, the public perception of the profession could be damaged.

If the district court's refusal to disqualify Kobin & Meyer is an error, it comes under the purview of review for errors of law.[3]

Finally, we note that this circuit has not heretofore addressed the issues raised in this case. They are important. The profession and the public will benefit by clear direction from this court. This case is, therefore, appropriate for mandamus relief.

## II. THE MERITS

[3] The trial court viewed the case as one involving an attorney's acceptance of employment adverse to a *former* client, and therefore tested Kobin & Meyer's actions against the standards set forth in Canon 4. In general Canon 4 prohibits an attorney from divulging confidences and secrets of a client. Under Canon 4 an attorney may not represent interests adverse to a former client if the factual context of the later representation is similar or related to that of the former representation. *Trone v. Smith,* 621 F.2d 994, 998 (9th Cir. 1980). *See generally, Pennwalt Corp. v. Plough, Inc.,* 85 F.R.D. 264, 270–71 (D.Del.1980).

[4–6] The case, however, is one in which the attorney undertook representation adverse to a *present* client. The questions

2. After this case was argued and submitted, the appellee filed a motion to dismiss the appeal on the authority of *Firestone Tire & Rubber Co. v. Risjord,* 449 U.S. ——, 101 S.Ct. 669, 66 L.Ed.2d 571 (1981). In *Firestone,* the Supreme Court said that mandamus was not the appropriate device by which to review the denial of the motion of attorney disqualification. It noted that:

"Petitioner has made no colorable claim that the harm it might suffer if forced to await the final outcome of the litigation before appealing the denial of its disqualification motion is any greater than the harm suffered by any litigant forced to wait until the termination of the trial before challenging interlocutory orders it considers erroneous."

*Firestone* is distinguishable. As the subsequent discussion in the text indicates, the harm in this case is greater than that suffered by an ordinary litigant forced to wait until the termination of the trial before challenging interlocutory orders it considers erroneous. Using the *Bauman v. United States Dist. Court,* 557 F.2d 650, 652 (9th Cir. 1977). guidelines, we have determined that this is an appropriate case for review. This case falls within that relatively narrow class of cases in which resort to man-

damus is appropriate in order to avoid irreparable injury resulting from delaying review until after a final judgment. *See generally,* Note, *The Appealability of Orders Denying Motions for Disqualification of Counsel in the Federal Courts,* 45 U.Chi.L.Rev. 450, 476–79 (1978) (cited with approval in *Firestone Tire, supra,* 101 S.Ct. at 676 n.13).

3. It is true that this opinion examines whether the district court abused its discretion by refusing to disqualify Kobin & Meyer. Nevertheless, because we decide as a matter of law that DR5–105(B) and (C) do not create a *per se* rule against dual representation in unrelated matters of clients with adverse interests, we view the case as one involving a question of law which is suitable for review on a writ of mandamus. *Cf. Allied Chemical Corp. v. Daiflon, Inc.,* —— U.S. ——, —— n.3, 101 S.Ct. 188, 191 n.3, 66 L.Ed.2d 193 (1980) (while suggesting that the court might in certain circumstances review a discretionary decision on a writ of mandamus, the court here did not have an adequate record to do so) *with* this case. An adequate record exists to review the abuse of discretion as well as the question of law.

thus raised are more appropriately treated under Canon 5.[4]  In contrast to representation undertaken adverse to a *former* client, representation adverse to a *present* client must be measured not so much against the similarities in litigation, as against the duty of undivided loyalty which an attorney owes to each of his clients.  *See* American Bar Foundation, *Annotated Code of Professional Responsibility* 229 (1979); *Cinema 5, Ltd. v. Cinerama, Inc.*, 528 F.2d 1384, 1386 (2nd Cir. 1976).  *See also, Pennwalt Corp. v. Plough, Inc.*, 85 F.R.D. 264, 271 (D.Del. 1980).

Disciplinary Rule 5–105(B) provides that:  "A lawyer shall not continue multiple employment if the exercise of his independent professional judgment in behalf of a client will be or is likely to be adversely affected by his representation of another client, except to the extent permitted under DR 5–105(C)."  Code of Professional Responsibility of the State of Oregon (1980).

In *International Business Machines Corp. v. Levin*, 579 F.2d 271 (3rd Cir. 1978), the Third Circuit did not require that "adverse effect" be specifically demonstrated.  It presumed that adverse effect resulted when an attorney took an adverse position to a present client.  We agree that a specific adverse effect need not be demonstrated to trigger DR5–105(B) if an attorney undertakes to represent a client whose position is adverse to that of a present client.  *See also In re Hedrick*, 258 Or. 70, 481 P.2d 71, 73–74

(1971) (attorney's legal relationship with client provided him with information which would adversely affect client in action brought against client by the attorney).  Accordingly, Kobin & Meyer's dual representation of Teeples & Thatcher and Jelco triggers DR5–105(B) because the representation is presumed to affect adversely Kobin & Meyer's representation of each.

Teeples & Thatcher argues, however, that Kobin & Meyer should not be disqualified under DR5–105(B) because of the exception set forth in DR5–105(C).  To avoid disqualification under DR5–105(B), an attorney must satisfy DR5–105(C)'s two conditions.[5]  First, each client must consent to the multiple representation after full disclosure of the risks.  Second, it must be "obvious" that the attorney can adequately represent the interests of each client.

*A. Consent.*

The leading case on the meaning of "consent" in Canon 5 of the disciplinary rules of the State Bar of Oregon is *In re Boivin*, 271 Or. 419, 533 P.2d 171 (1975).  The court stated that the consent must be an "informed consent" made after full disclosure of all of the material facts.  533 P.2d at 174.  The court further said:

"To satisfy the requirement of full disclosure by a lawyer before undertaking to represent two conflicting interests, it is not sufficient that both parties be informed of the fact that the lawyer is undertaking to represent both of them,

---

4.  Teeples & Thatcher argue that the "present-client approach" is inapplicable here because Jelco has dismissed Kobin & Meyer from its employ.  Jelco correctly cites *Fund of Funds, Ltd. v. Arthur Andersen & Co.*, 435 F.Supp. 84, 95 (S.D.N.Y.), *aff'd in part, rev'd in part on other grounds*, 567 F.2d 225 (2nd Cir. 1977), for the proposition that the present-client standard applies if the attorney simultaneously represents clients with differing interests.  This standard continues even though the representation ceases prior to filing of the motion to disqualify.  If this were not the case, the challenged attorney could always convert a present client into a "former client" by choosing when to cease to represent the disfavored client.

5.  Disciplinary Rule 5–105(C) provides that:  "In the situations covered by DR5–105(A) and (B), a lawyer may represent multiple clients if it is obvious that he can adequately represent the interest of each and if each consents to the representation after full disclosure of the possible effect of such representation on the exercise of his independent professional judgment on behalf of each."  Code of Professional Responsibility of the State of Oregon (1980).

but he must explain to them the nature of the conflict of interest in such detail so that they can understand the reasons why it may be desirable for each to have independent counsel, with undivided loyalty to the interests of each of them." *Id.*

[7] Jelco asserts that it did not give "informed consent" because Kobin & Meyer merely "informed" it of the conflict, rather than explained to it the "implications" of the conflict. The district court, on the other hand, found that "there was an informed and knowing waiver by Jelco of any conflict or apparent conflict...." This finding does not offend Fed.R.Civ.P. 52(a).

The record shows that Jelco knew from the beginning that Kobin & Meyer represented Teeples & Thatcher in a long-standing client relationship and that Teeples & Thatcher was involved in an embryonic dispute with Jelco. Jelco also knew that Kobin & Meyer would accept Jelco as a client only if that relationship would not inhibit Kobin & Meyer in continuing to act as Teeples & Thatcher's counsel.

As the dispute between Teeples & Thatcher and Jelco developed, Kobin & Meyer twice alerted Jelco's counsel to the potential conflict and asked whether Jelco wished to continue Kobin & Meyer's retainer. After consulting with Jelco's management, Jelco's counsel assured Kobin & Meyer that Jelco wished Kobin & Meyer to continue representing Jelco.

[8] We have no doubt that Jelco consented to the representation after full disclosure was made to Jelco and its own attorney.[6] The record shows that after Kobin & Meyer's disclosure, Jelco discussed the two actions and the possible conflict which would result with its own attorney, and then agreed to Kobin & Meyer's multiple representation. Consent was expressed not just on one occasion, but on two occasions.

Thus, the "consent" prong of DR5–105(C) is satisfied.

**B.  "Adequate Representation".**

[9]  The requirements of DR5–105(C) are not satisfied, however, by a mere showing of consent after full disclosure. The rule also requires that it be "obvious that [the lawyer] can adequately represent the interest of each [client]...." As the Oregon Supreme Court said in *In re Porter*, 283 Or. 517, 584 P.2d 744, 749 n.5 (1978), "[t]his is troubling language." The *Porter* court acknowledged, but did not resolve, the very issue confronting the court in this case—the meaning of the "adequate representation" part of DR5–105(C).  The court said:

"Because we have found that the full disclosure requirement of DR 5–105(C) was not met, we need not address the apparent further requirement of DR 5–105(C) that it be 'obvious that he [the lawyer] can adequately represent the interest of each.'

This is troubling language. The Bar contends that DR 5–105(C) states a two-part test. The issue of consent after full disclosure is not even reached until the initial requirement that 'it is obvious that he [the lawyer] can adequately represent the interest of each' is satisfied. The Bar argues that this requirement embodies the policy that differing interests may be represented only in rare cases. The following ethics opinions provide support [for] the Bar's position by treating the requirement that adequate representation

---

6. Jelco obviously no longer consents to Kobin & Meyer's representation of Teeples & Thatcher. Our analysis nonetheless turns on the effectiveness of Jelco's consent, however, because Jelco would be estopped from revoking its consent by everyone's reliance on its long-standing position.

  Jelco has also argued that it was unaware of the conflict and that its counsel could not bind Jelco on the question of dual representation. We are not prepared to so hold. The district court apparently treated the agency question as settled by general principles of agency, and counsel have cited to us no law that calls for a re-examination of this issue on the present record.

be obvious as a separate standard: Opinions of the Committee on Legal Ethics of the Oregon State Bar numbers 218 and 376; ABA Formal Opinion number 331 (12/15/72); ABA Informal Opinions numbers 1235 (8/24/72) and 1282 (11/21/73). To read the language of DR 5–105(C) literally, however, would make the representation of conflicting interests nearly impossible. The difficulty lies in the word 'obvious.' Once it is shown that the exercise of the lawyer's independent professional judgment would be or would likely be adversely affected (DR 5–105(A)), how could it ever be *'obvious'* that he could adequately represent the interest of each party?" 584 P.2d 749, n.5.

Our analysis of the history of DR5–105(C), the structure of the Code, and the relevant policy considerations convinces us that the latter approach mentioned by the *Porter* court (*i. e.*, that if adverse affect is shown, it is never *obvious* that an attorney can adequately represent both) is not the correct approach to DR5–105(C).

### 1. *Legislative History of DR5–105(C).*

The history of the consent provision in the Code of Professional Responsibility's conflict of interest section indicates that consent was never intended to be meaningless or ineffective. Canon 6 of the 1908 Code of Professional Responsibility,[7] provided that:

> "It is unprofessional to represent conflicting interests, except by express consent of all concerned given after a full disclosure of the facts. Within the mean-

ing of this canon, a lawyer represents conflicting interests when, in behalf of one client, it is his duty to contend for that which duty to another client required him to oppose." [8]

Although Canon 6 seemingly allowed multiple representation whenever the clients consented, the courts have interpreted it in a more restrictive manner.[9] In *Kelly v. Greason,* 23 N.Y.2d 368, 378–79, 244 N.E.2d 456, 462, 296 N.Y.S.2d 937, 945–46 (1968), for example, the court remanded on the issue of whether there was consent, but indicated in dicta that even with consent multiple representation is not always appropriate. The court noted that although Canon 6 expresses the general policy that a client who is fully cognizant of potential or actual conflicts is entitled to take his chances, multiple representation is not always allowed. The court stated that instances where the multiple representation would not be allowed would be when the public interest was involved or where the likelihood of prejudice to one party is extremely great. 23 N.Y.2d at 378, 244 N.E.2d at 462, 296 N.Y.S.2d at 945–46. *See, e. g., In re A. and B.,* 44 N.J. 331, 209 A.2d 101 (1965) (held, no conflicting dual representation, but a municipality's attorney may not also represent a land developer in that municipality. Consent is irrelevant when public interest is involved). Indeed, Henry Drinker, one of the leading authorities on the old Code, argued that "[Canon 6] does not sanction representation of conflicting interests in every case where such consent is given, but merely forbids it except in such cases." H. Drinker, *Legal Ethics* 120 (1953).

Despite the restrictive interpretation of Canon 6's expansive language, consent was

---

7. For a brief history of the development of the 1907 Code of Professional Responsibility—the first of the ABA—*see* H. Drinker, *Legal Ethics* 23–25 (1953).

8. *See* Drinker, *supra*, note 7, at 311.

9. *See, e. g., Jedwabny v. Philadelphia Transp. Co.,* 390 Pa. 231, 135 A.2d 252, 254 (1957), *cert. denied,* 355 U.S. 966, 78 S.Ct. 557, 2 L.Ed.2d 541 (1958) (held, no abuse of discretion to grant a new trial because the litigant did not have full

knowledge of the conflict, but stating that some conflicts are so critically adverse that representation is not allowed); ABA Comm. on Professional Ethics, Formal Opinions No. 132 (1935); ABA Comm. on Professional Ethics, Informal Opinions No. 1157 (1970); Opinions of the Comm. on Legal Ethics of the Oregon State Bar, No. 135 (1964) (and opinions cited therein).

still available to justify representation which would otherwise be improper. *See, e. g.,* Opinions of the Comm. on Legal Ethics of the Oregon State Bar, No. 57 (1957) (citing Canon 6 to say that with consent, an attorney may represent an insurance company and also sue it in an unrelated case on behalf of another client); *Arden v. State Bar of California,* 52 Cal.2d 310, 341 P.2d 6 (1959) (held, multiple representation of adopting parents and natural mother was not improper even though a conflict later developed because the attorney had obtained consent). Moreover, the ABA committee repeatedly refused to approve an amendment deleting the "express consent" clause in Canon 6. *See* H. Drinker, *Legal Ethics* 120, n.16 (1953); ABA Comm. on Professional Ethics, Informal Opinions No. 296 (unpublished, cited in ABA Opinions on Professional Ethics p. 28 (1967)).

Thus, Canon 6 of the old Code of Professional Responsibility contemplated that consent would be available to authorize multiple representation which would otherwise be inappropriate.

[10] In 1969, a new Model Code of Professional Responsibility was enacted. Disciplinary Rule 5–105(C), which differed from old Canon 6 in several respects, provided that:

"[A] lawyer may represent multiple clients if it is obvious that he can ade-

quately represent the interest of each and if each consents to the representation after full disclosure of the possible effect of such representation on the exercise of his independent judgment on behalf of each."

DR5–105(C) has a broader scope than Canon 6. Canon 6 only applied to "conflicting interests" which arose when the lawyer had a "duty to contend for that which duty to another client required him to oppose." DR5–105(C), in contrast to Canon 6, applies whenever the attorney's representation of one client is likely to be adversely affected by his representation of another client,[10] or when it would involve him in representing "differing interests." [11] Moreover, whereas Canon 6 on its face would have allowed representation of conflicting interests if there were "consent after full disclosure," DR5–105(C) requires that it also be "obvious" [12] that an attorney can "adequately represent" the clients with differing interests. The changes in the new Code appear to be changes in substance, not merely form.

The case law and bar association opinions have continued, however under DR5–105(C), to allow multiple representation in certain situations if there has been consent after full disclosure. *See* Opinions of the Comm. on Legal Ethics of the Oregon State Bar, No. 218 (1972) (attorney can represent both parties in a divorce if there are no

---

10. *See* the text of DR5–105(B), quoted on page 5, *supra,* and DR5–105(A) quoted in n.10, *infra.*

11. DR5–105(A) provides:
    "(A) A lawyer shall decline proffered employment if the exercise of his independent professional judgment in behalf of a client will be or is likely to be adversely affected by the acceptance of the proffered employment, or if it would be likely to involve him in representing differing interests, except to the extent permitted under DR5–105(C)."
    "Differing interests" is defined in the Code as:
    "[E]very interest that will adversely affect either the judgment or the loyalty of a lawyer to a client, whether it be a conflicting, inconsistent, diverse, or other interest . . . ."

12. DR5–105(C) underwent one significant change during the drafting process. In the

Tentative Draft, the rule read "a lawyer may represent multiple clients if a lawyer of ordinary prudence would believe that he could adequately represent the interest of each . . . ." In the Preliminary Draft, the words "a lawyer of ordinary prudence would believe he could" were replaced by the current wording, "it is obvious that he can." *See* American Bar Foundation, *Annotated Code of Professional Responsibility,* Textual & Historical Notes p. 242 (1979). The Annotation notes that some confusion over the meaning of "obvious" has occurred. *Id.* at 243. Without belaboring the point, we think "obvious" must refer to an objective standard under which the ability of the attorney adequately to represent each client is free from substantial doubt.

children and if there is no property of significant value; *Fulton v. Woodford*, 26 Ariz.App. 17, 545 P.2d 979, 982 (1976) (insurer's reservation of rights created a conflict of interest, but dual representation of insured and insurer was proper because there was consent; thus, no malpractice or bad faith cause of action available to insured against insurer); *Matter of Farr*, 264 Ind. 153, 340 N.E.2d 777, 782–83 (1976) (held, in a case involving a conflict against insurer and insured, that case did not fall within category of cases where multiple representation is absolutely prohibited; thus, representation would have been proper had disclosures been made, but none were); *see also, In re Hansen*, 586 P.2d 413, 415 (Utah 1978) (held, attorney must return fee where he did not obtain consent to advocate against a present client in an unrelated manner); *Matter of Kali*, 116 Ariz. 285, 569 P.2d 227, 229 (1977) (dual representation improper because no consent); *In re Taylor*, 567 F.2d 1183 (2nd Cir. 1977) (if consent is given, the court may not unilaterally interfere with a person's choice of counsel).

#### 2. *Structure of the Code.*

Giving effect to both elements of DR5–105(C) is not inconsistent with the remainder of the Code of Professional Responsibility. We note that although an attorney's actions are generally governed by the Code, with the attorney deciding the propriety of his actions, a few limited situations exist under the Code in which client consent justifies certain actions. *See* DR5–104(A) (business transactions with a client); DR5–101(A), DR5–105(A) and (B) (declining or discontinuing employment when judgment on behalf of a client is likely to be affect-

ed); DR4–101(B) (revealing confidences of a client); DR5–105 (settling similar claim of clients). DR5–105(C) is one of those few cases when consent can justify otherwise improper actions. This section has remained in the Code despite objections.[13]

#### 3. *Policy Grounds.*

**[11]** Policy reasons support our decision not to interpret DR5–105(C)'s "adequate representation" language in such a way as to abolish consent. It is true that from its representation of Jelco in the *Ace* matter, Kobin & Meyer was likely to gain information and insights from Jelco about such things as Jelco's institutional attitudes towards negotiation and settlement and Jelco's method of doing business. Such information undoubtedly could prove useful to an opponent. Nevertheless, while the practice of suing a client can be neither condoned nor encouraged,[14] we are not prepared to enunciate a *per se* rule that a client must forego in all circumstances his choice of a particular attorney merely because there is the foreseeability of a future conflict with one of the attorney's existing clients.

It is true that the court has an obligation to safeguard the integrity of the judicial process in the eyes of the public. *See Pennwalt Corp. v. Plough, Inc.*, 85 F.R.D. 264, 267 (D.Del.1980); *see also, Silver Chrysler Plymouth, Inc. v. Chrysler Motor Corp.*, 518 F.2d 751, 754, 759 (2nd Cir. 1975), and at p. 759 (Adams, J., concurring), *overruled on other grounds Armstrong v. McAlpin*, 625 F.2d 433 (2nd Cir. 1980), *vacated McAlpin v. Armstrong*, —— U.S. ——, 101 S.Ct. 911, 66 L.Ed.2d 835 (1981). But the impact upon the public's respect for lawyers may be too speculative to justify overriding the client's

---

**13.** *See* H. Drinker, *Legal Ethics* 120, n. 16 (1953); ABA Committee on Professional Ethics, Informal Opinions No. 296 (unpublished, cited in ABA Opinions on Professional Ethics p. 28 (1967).

**14.** The Code, the cases and the commentators agree that if there is any doubt as to whether

multiple representation would be appropriate, the attorney should decline the representation. *See, e. g., Complaint of Hershberger*, 288 Or. 559, 606 P.2d 623, 624 (Or.1980) (and cases and authorities cited therein); *International Business Machines Corp. v. Levin*, 579 F.2d 271 (3rd Cir. 1978); EC 5–15.

right to take a calculated risk and, with full knowledge, engage the attorney of his choice. We do not find it necessary to create a paternalistic rule that would prevent the client in every circumstance from hiring a particular attorney if the client knows that some detriment may result from that choice in a later suit. Clients who are fully advised should be able to make choices of this kind if they wish to do so. Our responsibility is to preserve a balance, delicate though it may be, between an individual's right to his own freely chosen counsel and the avoidance of representations where undivided loyalty is impossible. *See Trone v. Smith,* 621 F.2d 994, 1001 (9th Cir. 1980); *Silver Chrysler, supra,* 518 F.2d at 753. We think the Code strikes a balance on the side of an individual's right to choose his own counsel and against a *per se* rule forbidding multiple representation. *See also, In re Taylor,* 567 F.2d 1183, 1191 (2nd Cir. 1977) (stating that once the court decides that client consent should serve, the court is without power to unilaterally obstruct the choice of counsel).[15]

#### 4.  *Defining "Adequate Representation".*

Of course, saying that there will be situations in which it is appropriate for an attorney to represent a client who is suing another client is much easier than defining when the representation will meet DR5-105(C)'s "adequacy" requirements. Under both Canon 6 and DR5-105(C), the courts

have consistently said that representation is unavailable where the public interest is impaired or where there is a great likelihood that one party will be prejudiced.[16] Examples of such cases include a government attorney's representation of a client who is suing the government,[17] and an attorney's representation of both the plaintiff and the defendant in a particular suit.[18] We believe the "public interest" and "prejudice" language used on occasion by the courts is merely another way of saying that "adequate representation" could not be provided in those cases.

[12] None of the cases, however, sets forth the specific factors to use in determining when the representation is adequate. In determining whether it is obvious that an attorney can represent adverse parties, the court should look at factors such as: the nature of the litigation; the type of information to which the lawyer may have had access; whether the client is in a position to protect his interests or know whether he will be vulnerable to disadvantage as a result of the multiple representation; the questions in dispute (e. g., statutory construction versus disputes over facts) and whether a government body is involved.

Thus, the court will undoubtedly look at some of the factors which are considered in deciding whether representation against a former client is appropriate. *See Gas-a-Tron of Arizona v. Union Oil of California,*

15. We do not express any view about whether such conduct could serve as a basis for disciplinary proceedings. The Code's purpose is to guide lawyers in ethical conduct and to serve as a disciplinary code. Some of the same considerations are present in the litigation context, but the court is in addition concerned with the balancing of hardships to the litigants. We think it possible that, in unusual circumstances, counsel might properly be subjected to discipline and yet be allowed to continue representing the client in on-going litigation.

16. *See, e. g., Kelly v. Greason,* 23 N.Y.2d 368, 378–79, 244 N.E.2d 456, 462, 296 N.Y.S.2d 937, 945–46 (1968); *In re A. and B.,* 44 N.J. 331, 209 A.2d 101 (1965). *See generally,* Drinker, *supra,* note 7, at 120 (and opinions cited therein).

17. *See, e. g.,* Opinions of the Committee on Legal Ethics of the Oregon State Bar, No. 45 (1957).

18. *See, e. g., Sapienza v. New York News,* 481 F.Supp. 676, 680 (S.D.N.Y.1979); *see also, Rice v. Baron,* 456 F.Supp. 1361, 1374 (S.D.N.Y. 1978) (attorney disqualified where he represented two plaintiffs with possible counterclaims against each other; no showing of consent, but dicta that even if there had been consent there would have been a problem); *see generally,* ABA Committee on Professional Ethics, Informal Opinions, No. 1157 (1970) (consent insufficient where multiple representation could lead to breach of client confidences).

UNIFIED SEWERAGE AGENCY, ETC. v. JELCO INC. **1351**
Cite as 646 F.2d 1339 (1981)

534 F.2d 1322 (9th Cir.), *cert. denied,* 429 U.S. 861, 97 S.Ct. 164, 50 L.Ed.2d 139 (1976); *T. C. Theater Corp. v. Warner Bros. Pictures, Inc.,* 113 F.Supp. 265, 268 (S.D.N.Y.), *reh. den.,* 125 F.Supp. 233 (1953).

5.  *The Merits of this Case.*

[13]  We now consider whether it was "obvious" that Kobin & Meyer could adequately represent each of its clients in this instance. As a preliminary matter, we must decide whether the findings of fact made by the district court may be relied upon in deciding whether it was obvious that Kobin & Meyer could provide adequate representation. The district court found that there was "no substantial or close relationship between the subject matter of the Ace litigation and the subject matter of the Teeples & Thatcher litigation," and "no evidence to justify a finding that Kobin & Meyer [had] any special insight or advantage arising on account of its representation of Jelco in the Ace case which would give to Teeples & Thatcher any unfair advantage over Jelco." These findings of fact are consistent with Fed.R.Civ.P. 52(a).

Although the two actions arose out of the same construction contract between Jelco and Unified Sewerage, the nature of the cases is quite different. The action which Kobin & Meyer handled for Jelco involved only a narrow issue of contract interpretation. The issue was whether the use of a certain aeration equipment manufacturer constituted a change in Jelco's subcontract with Ace because Ace allegedly had to provide different and additional equipment than originally planned. The facts were virtually undisputed.

The action which Kobin & Meyer handled for Teeples & Thatcher and against Jelco involved the scheduling and sequencing of concrete work which was to be performed by Teeples & Thatcher for Jelco. Each party claimed that the other party delayed and interfered with its work. The only information furnished by Jelco to Kobin & Meyer in connection with the first action

concerned the pre-bid proposals on aeration equipment and electrical work, project specifications for aeration work, the subcontract negotiations between Jelco and Ace, the shop drawings and submittals prepared by Ace and expert testimony relative to costs differentiations for electrical installations. We conclude that the district court's findings of fact are not clearly erroneous.

[14, 15]  The next question this court must address is whether the district court abused its discretion in denying the motion to disqualify, given the above findings of fact. The appropriate standard for reviewing a district court's ruling on a motion for attorney disqualification is whether the ruling was an abuse of discretion. *See Gas-a-Tron of Arizona v. Union Oil Co. of California,* 534 F.2d 1322, 1325 (9th Cir. 1976). The rationale is that the primary responsibility for controlling the conduct of lawyers practicing before the district court lies with that court, not with us. *Id.; see Trone v. Smith,* 621 F.2d 994, 999 (9th Cir. 1980).

We find that the district court did not abuse its discretion. It is sufficiently obvious, for the purposes of the canon, that Kobin & Meyer could adequately represent both Jelco and Teeples & Thatcher in the several actions. The litigation in the two cases was quite different; one involved a question of contract interpretation and the other was a highly disputed factual claim concerning each party's performance. Although one umbrella contract covered each case, the individual contracts involved were quite different. As the findings of fact indicate, Kobin & Meyer did not have access to any specific information that would help Teeples & Thatcher prevail against Jelco (other than general information concerning the personality of a client, which is always helpful in later suits against that client). Jelco, fully advised by its regular counsel, was in a position to know all the risks it was taking in employing Kobin & Meyer.

We find no facts that suggest that Kobin & Meyer would be tempted to "soft pedal"

**1352**          **646 FEDERAL REPORTER, 2d SERIES**

the rights of one client in these cases so as not to jeopardize the position of another client. Nothing suggests that Kobin & Meyer had an incentive *not* to represent zealously the interests of each client in their respective cases. Accordingly, we find that it was as "obvious" as necessary that Kobin & Meyer could adequately represent Jelco and Teeples & Thatcher within the meaning of the canon.

## III.   CANON 9 AND THE APPEAR-ANCE OF IMPROPRIETY

[16, 17] Jelco has argued that Kobin & Meyer should be disqualified because the challenged multiple representation carries the appearance of impropriety. The point does, of course, raise questions. But, to paraphrase the *Silver Chrysler* court, we do not believe Canon 9 was intended to override the delicate balance created by Canon 5 and the decisions thereunder. *Silver Chrysler, supra,* 518 F.2d at 757. Having decided that Canon 5 was written to allow multiple representation in exceptional cases if all clients consented after full disclosure and if the attorney could adequately represent both parties, we do not read Canon 9 as an implied repeal of the multiple representation language in Canon 5 because it has "the appearance of impropriety."

The district court's failure to disqualify Kobin & Meyer was not an abuse of discretion on the facts of this case. Jelco consented after full disclosure and the court found that Kobin & Meyer could adequately represent both parties.

Accordingly, the ruling of the district court will not be disturbed.

Affirmed.



NATIONAL LABOR RELATIONS
BOARD, Petitioner,

and

Local Union No. 47, International Brotherhood of Electrical Workers,
AFL–CIO, Intervenor,

v.

SOUTHERN CALIFORNIA EDISON
COMPANY, Respondent.

No. 79–7435.

United States Court of Appeals,
Ninth Circuit.

Argued and Submitted July 2, 1980.

Decided June 1, 1981.

National Labor Relations Board sought enforcement of order holding that utility had violated National Labor Relations Act by threatening to discipline employees who honored lawful picket line established by another union representing utility employees and by disciplining an employee who refused to cross a lawful picket line at a customer's place of business. The Court of Appeals, Skopil, Circuit Judge, held that: (1) honoring a sister union's picket line at one's employer's place of business and respecting a picket line at customer's location were protected activities; (2) although such protection can be waived by contract, language and evidence bearing on parties' intents was insufficient to overcome deference due Board's determination that there was no waiver; (3) conclusion that employer violated NLRA by threatening to discipline employees who honored sister union's picket line was reasonably defensible; (4) finding that employer lacked business justification for disciplining an employee for honoring a stranger picket line at customer's place of business was supported by substantial evidence; and (5) there was no substantial evidence supporting finding

arrest Gumbs; they yelled at him to stop the car and get out. Right when they were about to arrest Gumbs, literally reaching into the car to grab ahold of him, Gumbs sped off. Moreover, the evidence supports a finding that Gumbs did so with "some amount of force." See Fernandez, 837 F.2d at 1035 ("The word 'forcibly' in section 111 means only that some amount of force must be used."). Officers were standing within a foot of Gumbs's car, reaching into the car, when he stepped on the gas pedal and sped off. We have held similar evidence to be sufficient for purposes of a § 111(b) conviction. See United States v. Gonzalez, 122 F.3d 1383, 1385–86 (11th Cir. 1997). In Gonzalez, for instance, police yelled at the defendant to get out of his car as he was trying to leave a parking lot. Id. at 1385. The defendant continued to flee, "seemingly without regard for persons and vehicles in [his] path," nearly hitting two police officers in the process. Id. The defendant paused once he reached a fence, behind which were two police cars blocking his path, and officers again told him to stop and get out. Id. Instead, the defendant "repeatedly rammed the fence, finally breaking through and ramming the [officers'] cars." Id. He "eventually ran aground on a stump" and was arrested. Id. On appeal, we held the evidence was sufficient to support his conviction under § 111(b), despite his claim that he did not intend to direct force at the officers and was "simply driving, head down, attempting to flee." See id. at 1386.

Finally, Gumbs's car was capable of causing serious bodily injury or death to another person. See United States v. Gualdado, 794 F.2d 1533, 1535 (11th Cir. 1986) ("An automobile has been held to constitute a deadly weapon when used to run down a law enforcement officer."). And he used the car in a way that could have

caused, and did cause, serious injury to the officers. Gumbs "floored the gas peddle [sic]" as the officers were inches away, yelling at him to get out, and reaching inside the car. Gumbs used the car to shake loose of the officers about to arrest him and break the blockade so he could get out of the parking lot. He just missed hitting the officers by his window and did hit Inspector Lempka. Even Gumbs admitted that his argument for acquittal was weakest as to the officers standing closest to the car (the officers whom the jury found him guilty of forcibly resisting). The evidence was sufficient to support Gumbs's conviction on count two of the indictment.

## CONCLUSION

The district court did not abuse its discretion in refusing to give Gumbs's proposed jury instructions and in giving a supplemental instruction in response to the jury's question. Because the evidence was sufficient to support Gumbs's conviction on count two of the indictment, we affirm.

**AFFIRMED.**



**UNILOC 2017 LLC, Uniloc USA, Inc., Uniloc Luxembourg S.A.,Plaintiffs-Appellants**

**v.**

**APPLE, INC.,Defendant-Appellee**

government wants. They want more than          that.'').

Electronic Frontier
Foundation,Intervenor-Appellee

**2019-1922, 2019-1923, 2019-
1925, 2019-1926**

United States Court of Appeals,
Federal Circuit.

Decided: July 9, 2020

**Background:** Patentee brought infringement action against alleged infringer. Alleged infringer moved to dismiss for lack of subject matter jurisdiction, asserting patentee's creditor had the right to license the asserted patents and patentee therefore lacked the right to exclude alleged infringer from using the patents and could not claim an "injury-in-fact." Patentee filed administrative motions to seal material referenced in alleged infringer's dismissal motion, and the United States District Court for the Northern District of California, William H. Alsup, J., denied the motions, and later denied patentee's motion for leave to file for reconsideration and its accompanying revised motion to seal. Patentee appealed.

**Holdings:** The Court of Appeals, Mayer, Circuit Judge, held that:

(1) District Court's orders denying motions to seal and subsequent motion for leave to file for reconsideration and its accompanying revised motion to seal qualified for immediate appeal under collateral order doctrine;

(2) District Court did not abuse its discretion in denying patentee's overbroad motions to seal its purportedly confidential information and that of its related entities referenced in alleged infringer's motion to dismiss; and

(3) District Court did not abuse its discretion in denying patentee's motion for leave to file for reconsideration of orders denying its motions to seal its purportedly confidential information

and that of its related entities and accompanying revised motion to seal; but

(4) District Court's orders denying patentee's motions to seal purportedly confidential information belonging to patentee's licensees and other third parties failed to make findings sufficient to allow Court of Appeals to adequately assess whether it properly balanced the public's right of access against the interests of the third parties.

Affirmed in part, vacated in part, and remanded.

**1. Courts ⇌96(7)**

Where an appeal does not involve substantive issues of patent law, the Court of Appeals will apply the law of the regional circuit in which the district court sits.

**2. Records ⇌32**

A district court's decision to seal or unseal court records is reviewed for abuse of discretion.

**3. Records ⇌32**

The question of whether a district court applied the correct legal standard when ruling on a motion to seal is reviewed de novo.

**4. Federal Courts ⇌3252**

Although the parties do not challenge the Court of Appeals' authority to consider an appeal, it has an independent duty to assure itself of jurisdiction.

**5. Federal Courts ⇌3278**

The collateral order doctrine provides a narrow exception to the final judgment rule, permitting appellate review of trial court orders affecting rights that will be irretrievably lost in the absence of an immediate appeal. 28 U.S.C.A. § 1291.

**6. Federal Courts** ⟾3278

To fall within the collateral order doctrine, as exception to final judgment rule, an order must at a minimum satisfy three conditions: (1) it must conclusively determine the disputed question, (2) resolve an important issue completely separate from the merits of the action, and (3) be effectively unreviewable on appeal from a final judgment. 28 U.S.C.A. § 1291.

**7. Records** ⟾32

District Court's orders denying patentee's administrative motions to seal material referenced in alleged infringer's motion to dismiss infringement action, and denying patentee's subsequent motion for leave to file for reconsideration and its accompanying revised motion to seal, qualified for immediate appeal under collateral order doctrine; the orders conclusively determined that patentee's purportedly confidential filings should be made public, the orders presented an important issue, separate from the merits of the underlying action, because they addressed the scope of a court's discretion to deny, in full, a litigant's sealing motion based upon its failure to comply with procedural rules, and the orders were effectively unreviewable on appeal from a final judgment because once the parties' confidential information was made publicly available, it could not be made secret again. 28 U.S.C.A. § 1291.

**8. Records** ⟾15, 30, 32

Courts recognize a general right to inspect and copy public records and documents, including judicial records and documents.

**9. Records** ⟾32

There is a strong presumption in favor of access to documents filed with a court.

**10. Records** ⟾32

The presumption of access to court records is based on the need for federal courts, although independent, and indeed, particularly because they are independent, to have a measure of accountability and for the public to have confidence in the administration of justice.

**11. Records** ⟾32

The strength of the presumption of access to court records varies depending on the type of document at issue.

**12. Records** ⟾32

Where materials are attached to a motion that is more than tangentially related to the underlying cause of action, a litigant must supply compelling reasons to shield them from public view.

**13. Records** ⟾32

District Court did not abuse its discretion in denying patentee's overbroad administrative motions to seal its purportedly confidential information and that of its related entities referenced in alleged infringer's motion to dismiss in infringement action; patentee failed to comply with local rule setting out the standards for filing documents under seal, including by asking the District Court to seal entire documents that included citations to case law and many matters of public record, based on no more than perfunctory assertions that the documents contained confidential information. U.S.Dist.Ct.Rules N.D. Cal., Civil Rule 79-5.

**14. Federal Courts** ⟾3577

Broad deference is given to a district court's interpretation of its local rules.

**15. Records** ⟾35

District Court did not abuse its discretion in denying patentee's motion for leave to file for reconsideration of orders denying patentee's administrative motions to

seal its purportedly confidential information and that of its related entities, referenced in alleged infringer's motion to dismiss in infringement action, and patentee's accompanying revised motion to seal; patentee identified no intervening change in the law and failed to show that, at the time of its original sealing request, it did not know, or in the exercise of reasonable diligence could not have discovered, any of the facts that it relied upon in support of its motion, rather, patentee's original sealing request was grossly excessive and the District Court sent a strong message that litigants should submit narrow, well-supported sealing requests in the first instance, thereby obviating the need for judicial intervention.   U.S.Dist.Ct.Rules N.D. Cal., Civil Rule 7-9, 79-5.

**16. Records ⟺32**

Judicial records are public documents almost by definition, and the public is entitled to access by default.

**17. Records ⟺32**

District Court's orders denying patentee's administrative motions to seal purportedly confidential information belonging to patentee's licensees and other third parties referenced in alleged infringer's motion to dismiss in infringement action failed to make findings sufficient to allow Court of Appeals to adequately assess whether it properly balanced the public's right of access against the interests of the third parties in shielding their financial and licensing information from public view, requiring vacating portions of District Court's orders denying sealing or redaction of the purportedly confidential information of third parties and remanding so that the District Court could make particularized determinations as to whether and, if so, to what extent, the materials of each of those parties should be made public.

Appeals from the United States District Court for the Northern District of California in Nos. 3:18-cv-00360-WHA, 3:18-cv-00363-WHA, 3:18-cv-00365-WHA, 3:18-cv-00572-WHA, United States District Judge William H. Alsup.

Aaron Jacobs, Prince Lobel Tye LLP, Boston, MA, argued for plaintiffs-appellants.

Doug J. Winnard, Goldman Ismail Tomaselli Brennan & Baum LLP, Chicago, IL, argued for defendant-appellee. Also represented by Michael T. Pieja, Alan Ernst Littmann.

Alexandra Helen Moss, Electronic Frontier Foundation, San Francisco, CA, argued for intervenor-appellee.

Before PROST, Chief Judge, MAYER and TARANTO, Circuit Judges.

MAYER, Circuit Judge.

Uniloc 2017 LLC, Uniloc USA, Inc., and Uniloc Luxembourg, S.A. (collectively "Uniloc") appeal orders issued by the United States District Court for the Northern District of California denying, in full, their motions to seal. *See Uniloc USA, Inc. v. Apple Inc.*, Nos. 3:18-cv-00360-WHA, 3:18-cv-00363-WHA, 3:18-cv-00365-WHA, 3:18-cv-00572-WHA (N.D. Cal. Jan. 17, 2019) ("*Sealing Order*"), *revised motion to seal and motion for leave to file for reconsideration denied by* *Uniloc 2017 LLC v. Apple Inc.*, Nos. 3:18-cv-00360-WHA, 3:18-cv-00363-WHA, 3:18-cv-00365-WHA, 3:18- cv-00572- WHA, 2019 WL 2009318 (N.D. Cal. May 7, 2019) ("*Reconsideration Order*"). For the reasons discussed below, we affirm in part, vacate in part, and remand.

### I. BACKGROUND

Uniloc filed four separate patent infringement actions against Apple Inc.

("Apple").[1] J.A. 42–44. On October 25, 2018, Apple moved to dismiss for lack of subject matter jurisdiction. J.A. 262–93. It argued that Uniloc had granted its creditor, Fortress Credit Co. LLC ("Fortress"), a license with the right to sublicense in the event of a Uniloc default. J.A. 267–88. According to Apple, because Uniloc had defaulted on its loan with Fortress, Fortress had the right to license the asserted patents and Uniloc therefore "lacked the right to exclude Apple from using the patents and could not claim an injury-in-fact." J.A. 267.

Apple's motion to dismiss referenced material that Uniloc had designated as highly confidential under a protective order entered by the district court, *see* J.A. 1–28, and it therefore filed an administrative motion to seal this material, *see* J.A. 255–57.[2] The parties filed similar sealing motions when Uniloc filed its opposition to Apple's motion to dismiss and Apple filed its reply. *See* J.A. 417–19, 458–61.

In its sealing motions, Uniloc asked the district court to seal most of the materials in the parties' underlying briefs, including citations to case law and quotations from published opinions. J.A. 414–15; *see* J.A. 279–87. It also requested that the court seal twenty-three exhibits in their entireties. J.A. 414–15; *see* J.A. 299–412, 422, 503. These exhibits included matters of public record, such as a list of Uniloc's active patent cases. *See* J.A. 388.

In support of its sealing requests, Uniloc filed three short declarations. *See* J.A. 413–16, 420–22, 502–04. These declarations listed the exhibits Uniloc sought to seal and stated that these exhibits "contain[ed] sensitive, confidential and proprietary information related to financial data, licensing terms and business plans with respect to various Uniloc entities" and that "disclosure of this extremely sensitive information would create a substantial risk of serious harm to the Uniloc entities." J.A. 503; *see also* J.A. 414–15, 422.

On November 28, 2018, the Electronic Frontier Foundation ("EFF") contacted counsel for Uniloc, asserting that its proposed redactions were excessive. J.A. 768.[3] EFF stated, moreover, that if the documents at issue were not "re-filed consistent with the public's right of access," it would move to formally intervene in the case and "ask the court to ... unseal improperly withheld material." J.A. 768. After Uniloc declined to revise its sealing requests, EFF filed a motion to intervene for the purpose of opposing Uniloc's sealing motions. J.A. 53.

On January 17, 2019, the district court denied, in full, the administrative motions to seal, stating that Uniloc had failed to provide "a compelling reason to justify sealing."[4] *Sealing Order*, slip op. at 1. According to the court, Uniloc's "generalized assertion of potential competitive harm

---

**1.** The infringement actions were originally brought by Uniloc USA, Inc. and Uniloc Luxembourg, S.A., but these entities subsequently moved to add Uniloc 2017 LLC as a party. J.A. 50.

**2.** Apple's motion took no position on how much of Uniloc's designated material should be sealed or redacted. J.A. 256.

**3.** When contacted by EFF, counsel for Apple stated that it was "not making any independent claim" that the material at issue was

"entitled to be sealed, and [took] no position on whether Uniloc's requests to seal ... [were] proper." J.A. 768.

**4.** The district court granted EFF's motion to intervene, but only for the purpose of appellate review. *See Sealing Order,* slip op. at 2. The court determined, moreover, that the materials referenced in the parties' motions to seal would remain under seal until the conclusion of the appellate process. *See* J.A. 30, 518–19.

fail[ed] to outweigh the public's right to learn of the ownership of the patents-in-suit—which grant said owner the right to *publicly* exclude others." *Id*. at 2.

The court stated, moreover, that Uniloc's request to seal covered an "astonishing" amount of material. *Id*. In support, it noted that Uniloc sought "to seal the majority of exhibits and large swaths of briefing and declarations," including portions of Apple's motion to dismiss "that simply quote[d] Federal Circuit law." *Id*. In the court's view, Uniloc's motion to seal was "far from narrowly tailored as required by" Northern District of California Civil Local Rule 79-5 ("Local Rule 79-5"). *Id*. (internal quotation marks omitted).

On February 15, 2019, after obtaining an extension of time, Uniloc filed a motion for leave to seek reconsideration.[5] J.A. 548–55. Uniloc stated that it was willing to make public more than ninety percent of the material it had originally sought to shield from disclosure. J.A. 552. In support of its motion, it submitted a declaration setting forth the individual grounds for redacting or sealing the remaining materials. *See* J.A. 574–88. Uniloc also submitted declarations from several of its third-party licensees, who stated that disclosure of their confidential and/or proprietary information, including the terms of their licenses with Uniloc, would cause them significant competitive harm. *See, e.g.*, J.A. 552, 576–88, 662–86.

Uniloc asserted that the court should seal a table showing the licenses it had entered into between 2010 and mid-2017, explaining that this table disclosed the names of its third-party licensees, the dates of their licenses, and the amounts paid for the licenses. J.A. 561, 567; *see* J.A. 646–48. Uniloc also sought to seal or re-

dact: (1) certain information related to its relationship with Fortress; (2) materials about a purportedly proprietary software platform; and (3) certain financial information pertaining to Uniloc and its related entities. *See* J.A. 548–88; *see also* J.A. 591–648, 689–785.

On May 7, 2019, the district court denied both Uniloc's motion for leave to file for reconsideration and its accompanying revised motion to seal. *Reconsideration Order*, 2019 WL 2009318, at *3. According to the court, Uniloc should have submitted a narrowly tailored request for sealing "right from the outset rather than over-classifying and then trying to get away with whatever [it could] on a motion to reconsider." *Id*. at *2.

The court asserted, moreover, that although Uniloc "grumble[d]" that it had insufficient time to properly narrow and support its original sealing request, it "could have easily requested additional time to file [its] supporting declaration." *Id*. at *2 n.2. Additionally, the court concluded that Uniloc had failed to provide "sufficient justification" for redacting or sealing the information identified in its revised sealing request, stating that its "supposed risk of . . . generalized competitive harm in future negotiations from disclosure did not . . . compellingly outweigh the public's interest in accessing this information." *Id*. at *2. The court explained that "the public has an especially strong interest in learning the machinations that bear on the issue of standing in the patent context" and that "[b]ecause Uniloc's rights flow directly from th[e] government-conferred power to exclude, the public . . . has a strong interest in knowing the full extent of the terms and conditions involved

---

**5.** Under Northern District of California Civil Local Rule 7-9 ("Local Rule 7-9"), litigants are required to obtain leave before filing a

motion for reconsideration. *See* N.D. Cal. Civ. Local R. 7-9(a).

in Uniloc's exercise of its patent rights and in seeing the extent to which Uniloc's exercise of the government grant affects commerce." *Id.* at *1.

The district court recognized that Uniloc's third-party licensees had "some interest in redacting licensing information (including their identit[ies] )" and that some of these licensees had filed declarations stating that they would suffer competitive harm from the disclosure of such licensing information. *Id.* at *3. In the court's view, however, the concerns of the third-party licensees did "not surmount the hurdle of showing a compelling reason to seal." *Id.* Uniloc then filed a timely appeal with this court.

## II. Discussion

### A. Standard of Review

[1–3]   "Where, as here, an appeal does not involve substantive issues of patent law, we apply the law of the regional circuit in which the district court sits." *Apple Inc. v. Samsung Elecs. Co.*, 727 F.3d 1214, 1220 (Fed. Cir. 2013) ("*Apple I*"). In the Ninth Circuit, a district court's decision to seal or unseal court records is reviewed for abuse of discretion. *See Ctr. for Auto Safety v. Chrysler Grp., LLC*, 809 F.3d 1092, 1096 (9th Cir. 2016); *In re Midland Nat. Life Ins. Co. Annuity Sales Practices Litig.*, 686 F.3d 1115, 1119 (9th Cir. 2012) ("*Midland*"). The question of whether a district court applied the correct legal standard when ruling on a motion to seal is reviewed de novo. *See Ctr. for Auto Safety*, 809 F.3d at 1096.

### B. The Collateral Order Doctrine

[4, 5]   Although the parties do not challenge our authority to consider this appeal, we have an independent duty to assure ourselves of jurisdiction. *See Arbaugh v. Y&H Corp.*, 546 U.S. 500, 514, 126 S.Ct. 1235, 163 L.Ed.2d 1097 (2006); *see also*

*Henderson ex rel. Henderson v. Shinseki*, 562 U.S. 428, 434, 131 S.Ct. 1197, 179 L.Ed.2d 159 (2011) (emphasizing that "federal courts have an independent obligation to ensure that they do not exceed the scope of their jurisdiction, and therefore they must raise and decide jurisdictional questions that the parties either overlook or elect not to press"). As a general rule, the jurisdictional reach of the federal appellate courts extends only to "final decisions of the district courts of the United States." 28 U.S.C. § 1291. The collateral order doctrine, however, provides a "narrow exception" to the final judgment rule, permitting appellate review of "trial court orders affecting rights that will be irretrievably lost in the absence of an immediate appeal." *Richardson-Merrell, Inc. v. Koller*, 472 U.S. 424, 430–31, 105 S.Ct. 2757, 86 L.Ed.2d 340 (1985) (citation and internal quotation marks omitted); *see also Cohen v. Beneficial Indus. Loan Corp.*, 337 U.S. 541, 546, 69 S.Ct. 1221, 93 L.Ed. 1528 (1949) (explaining that there is a right to appeal a "small class" of orders "which finally determine claims of right separable from, and collateral to, rights asserted in the action, too important to be denied review and too independent of the cause itself to require that appellate consideration be deferred until the whole case is adjudicated").

[6]   To fall within the collateral order doctrine, "an order must at a minimum satisfy three conditions: It must [1] 'conclusively determine the disputed question,' [2] 'resolve an important issue completely separate from the merits of the action,' and [3] 'be effectively unreviewable on appeal from a final judgment.' " *Richardson-Merrell*, 472 U.S. at 431, 105 S.Ct. 2757 (quoting *Coopers & Lybrand v. Livesay*, 437 U.S. 463, 468, 98 S.Ct. 2454, 57 L.Ed.2d 351 (1978)); *see Apple I*, 727 F.3d at 1220. These requirements are met here.

**[7]** There is no question that the district court's orders conclusively determined that Uniloc's purportedly confidential filings should be made public; there is likewise no dispute that they present an important issue—separate from the merits of the underlying action—because they address the scope of a court's discretion to deny, in full, a litigant's sealing motion based upon its failure to comply with procedural rules. *See Apple I*, 727 F.3d at 1220. Finally, the orders are "effectively unreviewable on appeal from a final judgment because once the parties' confidential information is made publicly available, it cannot be made secret again." *Id.*; *see Oliner v. Kontrabecki*, 745 F.3d 1024, 1025 (9th Cir. 2014) (explaining that "an order denying a motion to unseal or seal documents is appealable either as a final order under 28 U.S.C. § 1291 or as a collateral order" (citation and internal quotation marks omitted)); *Al Odah ex rel. Al Odah v. United States*, 559 F.3d 539, 544 (D.C. Cir. 2009) (invoking the collateral order doctrine to exercise jurisdiction over an appeal of an order compelling the government to share classified information and explaining that "[o]nce the information is disclosed, the 'cat is out of the bag' and appellate review is futile" (citation omitted)).

### C.   Public Access to Judicial Records and Documents

**[8]** "It is clear that the courts of this country recognize a general right to inspect and copy public records and documents, including judicial records and documents." *Nixon v. Warner Commc'ns, Inc.*, 435 U.S. 589, 597, 98 S.Ct. 1306, 55 L.Ed.2d 570 (1978) (footnotes omitted); *see Ex parte Uppercu*, 239 U.S. 435, 439–41, 36 S.Ct. 140, 60 L.Ed. 368 (1915). This right of access supports "the citizen's desire to keep a watchful eye on the workings of public agencies." *Nixon*, 435 U.S.

at 598, 98 S.Ct. 1306; *see also Metlife, Inc. v. Fin. Stability Oversight Council*, 865 F.3d 661, 665 (D.C. Cir. 2017) ("Like the First Amendment . . . the right of inspection serves to produce an informed and enlightened public opinion." (citation and internal quotation marks omitted)).

**[9, 10]** There is a strong presumption in favor of access to documents filed with a court. *See Ctr. for Auto Safety*, 809 F.3d at 1096; *see also In re Violation of Rule 28(D)*, 635 F.3d 1352, 1356 (Fed. Cir. 2011). "The presumption of access is 'based on the need for federal courts, although independent—indeed, particularly because they are independent—to have a measure of accountability and for the public to have confidence in the administration of justice.'" *Ctr. for Auto Safety*, 809 F.3d at 1096 (quoting *United States v. Amodeo*, 71 F.3d 1044, 1048 (2d Cir. 1995)); *see also Valley Broad. Co. v. U.S. Dist. Ct. for the Dist. Nev.*, 798 F.2d 1289, 1294 (9th Cir. 1986) (emphasizing that the presumption of public access "promot[es] the public's understanding of the judicial process and of significant public events").

**[11, 12]** In the Ninth Circuit, the strength of the presumption of access varies depending on the type of document at issue. *See Kamakana v. City & Cty. of Honolulu*, 447 F.3d 1172, 1178–80 (9th Cir. 2006). Where, as here, materials are attached to a motion that is "more than tangentially related to the underlying cause of action," a litigant must supply compelling reasons to shield them from public view. *Ctr. for Auto Safety*, 809 F.3d at 1099; *see Kamakana*, 447 F.3d at 1179 (emphasizing that "compelling reasons must be shown to seal judicial records attached to a dispositive motion" and that this "compelling reasons standard is invoked even if the dispositive motion, or its attachments, were previously filed under

. . . [a] protective order" (citation and internal quotation marks omitted)).

### D.   The Sealing Orders

At the outset, we note that Uniloc seeks to shield two broad classes of materials from public disclosure: (1) its own purportedly confidential and/or sensitive information and that of its related entities; and (2) the purportedly confidential and/or sensitive information of third parties. We address each class of materials in turn.

### E.   Materials of Uniloc and Related Entities

**[13, 14]**   "Broad deference is given to a district court's interpretation of its local rules." *Bias v. Moynihan*, 508 F.3d 1212, 1223 (9th Cir. 2007); *see also Grove v. Wells Fargo Fin. Ca., Inc.*, 606 F.3d 577, 582 (9th Cir. 2010) ("Only in rare cases will we question [a district court's] exercise of discretion in connection with the application of local rules." (citations and internal quotation marks omitted)); *Christian v. Mattel, Inc.*, 286 F.3d 1118, 1129 (9th Cir. 2002) (emphasizing that the "district court has considerable latitude in managing the parties' motion practice"). Here, because Uniloc failed to comply with either Local Rule 79-5, which sets out the standards for filing documents under seal, or Local Rule 7-9, which sets out the standards for reconsideration, the district court did not abuse its discretion in denying Uniloc's motions to seal its purportedly confidential information and that of its related entities.

Pursuant to Local Rule 79-5, any motion to seal "must be narrowly tailored to seek sealing only of sealable material." N.D. Cal. Civ. Local R. 79-5(b). As the district court correctly determined, Uniloc's original attempt to comply with this requirement fell woefully short. *See Sealing Order*, slip op. at 2 (stating that the scope of Uniloc's original sealing request was "as-

tonishing"). Uniloc asked the district court to seal most of the briefing related to Apple's motion to dismiss, including citations to case law and quotations from published opinions of this court. J.A. 414–15; *see* J.A. 279–87. It also sought to seal large chunks of its attorney declarations and twenty-three exhibits in their entireties, J.A. 414–15; *see* J.A. 295–412, 422, 503, notwithstanding the fact that these exhibits included many matters of public record, such as a list of Uniloc's active patent cases, J.A. 388, and a list of its patents, J.A. 366.

Significantly, moreover, Local Rule 79-5 specifically provides that any party who seeks to seal material "must file a declaration . . . establishing that all of the designated material is sealable." N.D. Cal. Civ. Local R. 79-5(e)(1); *see Kamakana*, 447 F.3d at 1181–83 (explaining that a party seeking to keep materials confidential must show the specific injury that would result if a document were made public). Uniloc, however, sought sealing of entire documents based on no more than perfunctory assertions that the documents in question "contain[ed] sensitive, confidential and proprietary information related to financial data, licensing terms and business plans with respect to various Uniloc entities" and that "disclosure of this extremely sensitive information would create a substantial risk of serious harm to the Uniloc entities." J.A. 414; *see also* J.A. 422. Under such circumstances, the district court had ample support for its determinations that Uniloc's declarations were insufficient to support its motion to seal and that its sealing request was "far from narrowly tailored as required by [Local Rule 79-5]." *Sealing Order*, slip op. at 2 (internal quotation marks omitted); *see Kamakana*, 447 F.3d at 1182 (explaining that a party's "conclusory" statements about the confidential nature of certain documents did

"not rise to the level of compelling reasons sufficiently specific to bar the public access to the documents" (internal quotation marks omitted)).

[15]  On appeal, Uniloc does not meaningfully dispute that its original motion to seal was overbroad. Instead, it argues that since it agreed, in connection with its motion for leave to file for reconsideration, to make public more than ninety percent of the materials it originally sought to seal, J.A. 552, the district court abused its discretion in refusing to grant its new, narrower request to seal.

We do not find this argument persuasive. Under Local Rule 7-9, a litigant, in order to obtain leave to file a motion for reconsideration, must establish:

(1) That at the time of the motion for leave, a material difference in fact or law exists from that which was presented to the Court before entry of the interlocutory order for which reconsideration is sought. The party also must show that in the exercise of reasonable diligence the party applying for reconsideration did not know such fact or law at the time of the interlocutory order; or

(2) The emergence of new material facts or a change of law occurring after the time of such order; or

(3) A manifest failure by the Court to consider material facts or dispositive legal arguments which were presented to the Court before such interlocutory order.

N.D. Cal. Civ. Local R. 7-9(b).

Uniloc failed to meet any of these requirements. In moving for leave to file for reconsideration, it identified no intervening change in the law and failed to show that, at the time of its original sealing request, it did not know, or in the exercise of reasonable diligence could not have discovered, any of the facts that it relied upon in

support of its motion. To the contrary, although it was cloaked in the guise of a motion for leave to file for reconsideration, Uniloc's filing was, in reality, an attempt to gain a "second shot" at complying with Local Rule 79-5's prerequisites for filing documents under seal. As the district court correctly concluded, Uniloc should have submitted a narrowly tailored sealing request "right from the outset rather than over-classifying and then trying to get away with whatever [it could] on a motion to reconsider." *Reconsideration Order*, 2019 WL 2009318, at *2; *see Carroll v. Nakatani*, 342 F.3d 934, 945 (9th Cir. 2003) (explaining that reconsideration is an "extraordinary remedy, to be used sparingly in the interests of finality and conservation of judicial resources" (citation and internal quotation marks omitted)); *Kona Enters., Inc. v. Estate of Bishop*, 229 F.3d 877, 890 (9th Cir. 2000) (emphasizing that a motion for reconsideration "may *not* be used to raise arguments or present evidence for the first time when they could reasonably have been raised earlier in the litigation"); *Turner v. City & Cty. of S.F.*, 892 F. Supp. 2d 1188, 1224 (N.D. Cal. 2012) (emphasizing that a motion for reconsideration under Local Rule 7-9 "cannot be used to raise arguments or present evidence for the first time when they could reasonably have been raised earlier").

## F.   Uniloc's Contentions

Uniloc argues that "[c]ourts within the Ninth Circuit regularly find compelling reasons to seal documents containing valuable, competitive business information" because such information qualifies as a trade secret, and that the district court here abused its discretion in deviating from this practice. Br. of Appellants 32. This argument falls flat. As a threshold matter, this is not a case where a party submitted a slightly overbroad sealing request and la-

ter admitted that some of the redactions it initially proposed were not required. To the contrary, Uniloc's original sealing request was grossly excessive and its flouting of Local Rule 79-5 particularly flagrant. *See Sealing Order*, slip op. at 2; *see also In re Violation of Rule 28(D)*, 635 F.3d at 1360 (decrying a litigant's "blatant[ly] . . . improper confidentiality markings," which extended to case citations and quotations from published opinions).

Even assuming *arguendo*, moreover, that some of the materials Uniloc currently seeks to shield might qualify as trade secrets, the issue on appeal is not whether trial courts are, in general, obligated to grant a narrow motion to seal trade secret information. *See Apple Inc. v. Psystar Corp.*, 658 F.3d 1150, 1162 (9th Cir. 2011) ("*Apple II*") ("The publication of materials that could result in infringement upon trade secrets has long been considered a factor that would overcome th[e] strong presumption" of access to court filings.). Instead, the dispositive question is whether the district court abused its discretion in denying a motion to reconsider a motion to seal, where the motion to reconsider failed to meet the requirements of Local Rule 7-9, and where the motion to seal was, indisputably, neither narrowly tailored nor adequately supported. *See Sealing Order*, slip op. at 2 (explaining that while Uniloc's supporting declarations stated that disclosure of its purportedly confidential information would cause competitive injury, they "provide[d] no further explanation regarding why or how public disclosure of this information could cause commercial harm").

Our decision in *Apple I* is not to the contrary. There, we concluded that the district court abused its discretion in refusing to redact certain product-specific financial information, such as profit, cost, and margin data, as well as certain proprietary

market research reports. *Apple I*, 727 F.3d at 1222–23. Importantly, however, the parties in that case supported the need for such redactions with detailed declarations describing both the competitive injury that would result if such information were disclosed and the significant efforts they had made to keep their product-specific financial information confidential. *Id.* at 1218–19, 1223–25. Furthermore, because the documents in question were not "introduced into evidence . . . the financial information at issue was not considered by the jury and [was] not essential to the public's understanding of the jury's damages award." *Id.* at 1226.

More fundamentally, the primary issue in *Apple I* was whether the district court erred in concluding that "the parties' strong interest in keeping their detailed financial information sealed" failed to override "the public's relatively minimal interest in this particular information." *Id.* We had no occasion to address the central issues presented here, which are whether a district court abuses its discretion by applying local procedural rules to deny an overbroad and unsupported motion to seal and a subsequent motion for reconsideration.

Uniloc further maintains that the district court erred in refusing to redact the specific dollar amounts and financial terms in certain agreements because Apple's motion to dismiss for lack of subject matter jurisdiction " 'did not directly depend' " on this information. Br. of Appellants 26 (quoting *Reconsideration Order*, 2019 WL 2009318, at *2). In support, it argues that although Apple alleged that "Uniloc was . . . required to license its patents for at least a certain amount of money by a certain deadline," it was irrelevant "whether the threshold was $10,000,000 or $10." *Id.*

[16]  This argument has it backwards. *See Kamakana*, 447 F.3d at 1181–82. The district court was not required to seal any information that was not "directly relevant" to its ruling on Apple's motion to dismiss; instead, all filings were presumptively accessible, and it was Uniloc's duty to provide compelling reasons for shielding particular materials from public view. *See, e.g.*, *Ctr. for Auto Safety*, 809 F.3d at 1098 ("[O]ur precedent . . . presumes that the compelling reasons standard applies to *most* judicial records." (citations and internal quotation marks omitted)); *Kamakana*, 447 F.3d at 1182 ("The judge need not document compelling reasons to unseal; rather the proponent of sealing bears the burden with respect to sealing."). As the Ninth Circuit has made clear, "judicial records are public documents almost by definition, and the public is entitled to access by default." *Kamakana*, 447 F.3d at 1180. Here, Uniloc had the opportunity to present compelling reasons for sealing or redacting its purportedly confidential information when it submitted its original motion to file under seal. *See id.* at 1181 ("But, in fact, the [City of Honolulu] did have a chance to show 'compelling reasons' and squandered it.").

We likewise reject Uniloc's argument that it should have been given the opportunity to submit a revised, more narrowly tailored motion to seal because "[g]iving litigants a second (and third) chance to address the court's concerns regarding motions to seal is the usual practice of the Northern District of California." Br. of Appellants 49 n.22.[6] We do not dispute that, at least in some circumstances, a district court may appropriately give parties additional opportunities to more narrowly tailor their requests to seal. But the fact that other courts, under other circumstances, have permitted litigants to submit revised sealing requests does not mean that the district court was required to do so here. *See Camreta v. Greene*, 563 U.S. 692, 709 n.7, 131 S.Ct. 2020, 179 L.Ed.2d 1118 (2011) ("A decision of a federal district court judge is not binding precedent in either a different judicial district, the same judicial district, or even upon the same judge in a different case." (citation and internal quotation marks omitted)); *Nixon*, 435 U.S. at 599, 98 S.Ct. 1306 (explaining that the decision regarding access to judicial records is "one best left to the sound discretion of the trial court, a discretion to be exercised in light of the relevant facts and circumstances of the particular case" (footnote omitted)); *Skky, LLC v. Facebook, Inc.*, 191 F. Supp. 3d 977, 981 (D. Minn. 2016) (denying a litigant's second, narrower motion to seal, notwithstanding the fact that it was unopposed, and stating that parties should not be allowed "to stipulate away the public's right of access without an adequate basis for doing so").

In this regard, Local Rule 79-5 clearly put Uniloc on notice that its motion to seal

---

6.  We need not, and therefore do not, address the question of whether the district court, in denying Uniloc's motion for reconsideration, properly weighed factors such as the public's "interest in learning the machinations that bear on the issue of standing in the patent context" and its "interest in knowing the full extent of the terms and conditions involved in Uniloc's exercise of its patent rights." *Reconsideration Order*, 2019 WL 2009318, at *1. Regardless of whether it properly weighed such factors in determining that Uniloc had not established sufficiently compelling reasons to support its revised sealing request, the fact that there had been no "emergence of new material facts or . . . change of law," N.D. Cal. Civ. Local R. 7-9(b)(2), since the court's original sealing order provides an independent basis for affirming the court's decision to deny reconsideration. *See, e.g., Dittman v. California*, 191 F.3d 1020, 1027 n.3 (9th Cir. 1999) (emphasizing that an appellate "court may affirm on any ground supported by the record").

could be "denied in its entirety" and that "[a] sealing order [would] issue only upon a request that establish[ed] that the document, or portions thereof, [were] privileged, protectable as a trade secret or otherwise entitled to protection under the law." N.D. Cal. Civ. Local R. 79-5(b), (f)(2); *see Nevro Corp. v. Bos. Sci. Corp.*, 312 F. Supp. 3d 804, 805 (N.D. Cal. 2018) (denying an overbroad motion to seal as well as a motion for reconsideration of that denial and imposing sanctions on a law firm for filing these "frivolous" motions).[7] A district court does not abuse its discretion simply because it elects to strictly enforce its local procedural rules. *See, e.g.*, *Grove*, 606 F.3d at 582 (affirming a district court's decision to deny a party's request for taxable costs because the party "failed to comply with the local rules governing motions for [such] costs"); *Christian*, 286 F.3d at 1129 (concluding that a district court did not abuse its discretion in refusing to consider any of a litigant's supplemental filings given that he "failed to comply with local rules regarding page limitations and typefaces").

Trial court judges, heavily burdened with the task of resolving complex legal and factual disputes, must also serve as the gatekeepers for vast quantities of information. They should not be forced to spend large swaths of their time struggling to rein in overzealous efforts to seal. *See Reconsideration Order*, 2019 WL 2009318, at *2 n.2 ("Because of the frequently overbroad requests to seal arising in patent litigation today, the Court … must now deal with these burdensome motions to seal on a regular basis."); *see also Takeda Pharm. U.S.A., Inc. v. Mylan Pharm.,*

*Inc.*, No. cv-19-2216-RGA, 2019 WL 6910264, at *1 (D. Del. Dec. 19, 2019) ("In my experience, corporate parties in complex litigation generally prefer to litigate in secret. To that end, discovery is over-designated as being confidential, pleadings and briefs are filed under seal, redacted versions of sealed documents are over-redacted, requests are made to seal portions of transcripts of judicial proceedings, and parties want to close the courtroom during testimony."); *Cardiac Pacemakers, Inc. v. St. Jude Med., Inc.*, No. 1:96-cv-1718-DFH-TAB, 2007 WL 141923, at *2 (S.D. Ind. Jan. 16, 2007) ("[A]ll too frequently this Court finds itself reviewing overbroad and unsupported requests to file documents under seal. Lest practitioners suspect the Court is overstating its case, counsel in one case recently filed a motion seeking to file excerpts from the Federal Register under seal.").

In denying Uniloc's sweeping motion to seal, the district court sent a strong message that litigants should submit narrow, well-supported sealing requests in the first instance, thereby obviating the need for judicial intervention. Because the court "took seriously the presumption of public access and did so in accord with precedent from the Supreme Court and [the Ninth Circuit]," *Kamakana*, 447 F.3d at 1187, we conclude that there was no abuse of discretion in its decision to deny Uniloc's requests to seal its purportedly confidential information and that of its related entities.

### G.   Information of Third Parties

We now turn to the purportedly confidential information belonging to Uniloc's licensees and other third parties.[8] Such third parties were not responsible for Uni-

---

**7.** We recently issued a decision on the merits of the underlying infringement action in this case. *See Nevro Corp. v. Bos. Sci. Corp.,* 955 F.3d 35 (Fed. Cir. 2020).

**8.** In addition to information regarding its third-party licensees, Uniloc seeks to shield certain information related to its financial relationship with Fortress. *See, e.g.,* Br. of Appellants 38, 42–43, 45. We leave to the

loc's filing of an overbroad sealing request. Their information calls for an analysis not dependent on the overbreadth rationale just discussed.

The district court rejected Uniloc's attempt to prevent disclosure of information related to its third-party licensees, including the licensees' names, the duration of their licenses, and the specific royalty rate each licensee paid. *See, e.g.*, J.A. 322–24, 646–48. Uniloc asserts that almost all of its third-party license agreements included a confidentiality provision, indicating that the information in the agreements was "proprietary and confidential," and that "the vast majority of these agreements were entered into under the auspices of protective orders signed by district court judges." Br. of Appellants 13. Significantly, moreover, many of Uniloc's licensees have submitted declarations stating that they wish their licensing information to remain confidential and that the disclosure of such information would cause them material competitive injury. J.A. 577–84; *see also* J.A. 649–86, 760–61, 780–82.

[17]  As to these third-party materials, we conclude that the district court failed to make findings sufficient to allow us to adequately assess whether it properly balanced the public's right of access against the interests of the third parties in shielding their financial and licensing information from public view. *See Midland*, 686 F.3d at 1119 (explaining that "[w]hen rul-

ing on a motion to seal court records, the district court must balance the competing interests of the public and the party seeking to seal judicial records"); *Foltz v. State Farm Mut. Auto. Ins. Co.*, 331 F.3d 1122, 1135 (9th Cir. 2003) (emphasizing that a district court must explain its reasoning when making a decision on sealing in order to permit "meaningful appellate review of whether relevant factors were considered and given appropriate weight" (citations and internal quotation marks omitted)). In this regard, there is no indication in the record that the court assessed whether any of the third-party information was "protectable as a trade secret or otherwise entitled to protection under the law," N.D. Cal. Civ. Local R. 79-5(f)(2); *see Apple II*, 658 F.3d at 1162. We therefore vacate those portions of the district court's orders which denied sealing or redaction of the purportedly confidential information of third parties and remand so that the court may make particularized determinations as to whether and, if so, to what extent, the materials of each of these parties should be made public.[9] *See Apple II*, 658 F.3d at 1162; *see also Foltz*, 331 F.3d at 1137 (concluding that "third-party medical and personnel records [should] be redacted . . . to protect third-party privacy interests").

### III. CONCLUSION

Accordingly, the orders of the United States District Court for the Northern

district court's sound discretion the question of whether the interests of Fortress are so closely aligned with those of Uniloc that it should be deemed a Uniloc-related entity for purposes of determining whether its purportedly confidential materials should be sealed or redacted. *See, e.g., Barsten v. Dep't of Interior*, 896 F.2d 422, 424 (9th Cir. 1990) ("We decline to consider the issue here, believing that the wiser course is to allow the district court to rule on it in the first instance.").

9.  Apple contends that the district court properly denied Uniloc's motion for reconsidera-

tion on procedural grounds, but states that "pricing terms, royalty rates, and minimum payment terms of licensing agreements" generally qualify as "trade secrets, and thus are sealable." Br. of Appellee 16 (citation and internal quotation marks omitted). At oral argument, it stated that it would not object if the district court, on remand, decided to seal a table, J.A. 322–24, 646–48, which provides the names of Uniloc's third-party licensees, the duration of their licenses, and the specific royalty rate each licensee paid. *See* Oral Arg. at 31:52–32:40.

DANA-FARBER CANCER INSTITUTE v. ONO PHARMACEUTICAL    **1365**
Cite as 964 F.3d 1365 (Fed. Cir. 2020)

District of California are affirmed in part, vacated in part, and the case is remanded for further consideration in accordance with this opinion.

**AFFIRMED IN PART, VACATED IN PART, AND REMANDED**

Costs

Each party will bear its own costs.



**DANA-FARBER CANCER INSTITUTE, INC.,**
Plaintiff-Appellee

v.

**ONO PHARMACEUTICAL CO., LTD., Tasuku Honjo, E.R. Squibb & Sons, L.L.C., Bristol-Myers Squibb Company, Defendants-Appellants**

2019-2050

United States Court of Appeals, Federal Circuit.

Decided: July 14, 2020

**Background:** Cancer treatment and research center brought action against named inventor and related pharmaceutical and biotechnology research companies, seeking to correct inventorship of six disputed patents claiming methods of cancer immunotherapy. Following bench trial, the United States District Court for the District of Massachusetts, Patti B. Saris, J., 379 F.Supp.3d 53, entered judgment for center and added co-inventors. Pharmaceutical companies appealed.

**Holdings:** The Court of Appeals, Lourie, Circuit Judge, held that researchers contributed to conception of inventions in pat-

ents claiming specific methods of treating cancer, and thus were joint inventors on patents.

Affirmed.

**1. Patents ⌖1187**

District courts may order the correction of patent inventorship by the United States Patent and Trademark Office on notice and hearing of all parties concerned. 35 U.S.C.A. § 256(b).

**2. Patents ⌖861**

A valid patent requires correct inventorship.

**3. Patents ⌖1970(8)**

Patent inventorship is a question of law reviewed de novo, but the district court's underlying findings of fact are reviewed for clear error.

**4. Patents ⌖891**

A "joint invention" is simply the product of a collaboration between two or more persons working together to solve the problem addressed.

See publication Words and Phrases for other judicial constructions and definitions.

**5. Patents ⌖891**

To be a joint inventor on a patent, one must: (1) contribute in some significant manner to the conception or reduction to practice of the invention, (2) make a contribution to the claimed invention that is not insignificant in quality, when that contribution is measured against the dimension of the full invention, and (3) do more than merely explain to the real inventors well-known concepts and/or the current state of the art.

**6. Patents ⌖891**

There is no explicit lower limit on the quantum or quality of inventive contribu-

**1368**                    **179 FEDERAL REPORTER, 3d SERIES**

to be priced lower than the previous one. Yet, the price for the third stage, $3,061,-590, is actually higher than the second stage price, $3,049,879. Moreover, the Board itself has explicitly rejected this argument in the past. *See Celesco*, 81–2 BCA at ¶ 75,559 (refusing the Government's argument "that the claim for loss of learning should be denied because appellant failed to demonstrate that it had used learning curve principles . . . when preparing its bid").

This court holds that VHC is not precluded from recovering unamortized labor learning costs where the terminated portion of the contract was originally included by exercise of an option; nor is recovery automatically prohibited where the original contract pricing was not level. However, to recover unamortized labor learning costs, VHC must still prove that it experienced positive labor learning during performance of the unterminated portion of the contract.

COSTS

Each party shall bear its own costs.

*REVERSED AND REMANDED.*

**Milton R. STONE, Petitioner,**

v.

**FEDERAL DEPOSIT INSURANCE CORPORATION, Respondent.**

**No. 98–3012.**

United States Court of Appeals,
Federal Circuit.

June 11, 1999.

Terminated federal employee sought review of final decision of Merit Systems Protection Board (MSPB) sustaining his removal, arguing that ex parte communication between proposing and deciding officials violated his due process rights. The Court of Appeals, Gajarsa, Circuit Judge, held that: (1) employee had property interest in continued employment created by federal statutory employment scheme, and (2) receipt of ex parte communications that introduce new and material information to deciding official in removal proceedings violates due process.

Vacated and remanded.

**1. Constitutional Law ⬅277(2)**

Public employee's federal constitutional due process claim arising from termination of employment depends on employee having a property right in continued employment.  U.S.C.A. Const.Amend. 5.

**2. Constitutional Law ⬅278.4(5)**

Procedural safeguards afforded to public employee by the Fourteenth Amendment are no less stringent than those which must be provided under the due process clause of the Fifth Amendment.  U.S.C.A. Const.Amends. 5, 14.

**3. Constitutional Law ⬅254(3)**

Federal agency may not, consistently with the Fifth Amendment due process clause, do that which a state is forbidden to do by the Fourteenth Amendment due process clause.  U.S.C.A. Const.Amends. 5, 14.

**4. Constitutional Law ⬅277(1, 2)**

Property interests protected by due process clause come in a variety of forms, including public employment.  U.S.C.A. Const.Amend. 5.

**5. Constitutional Law ⬅278.4(1)**

If public employee possesses property interest in employment, then the govern-

ment cannot deprive him or her of this property without due process. U.S.C.A. Const.Amend. 5.

**6. Constitutional Law ⟐277(1)**

Property interests protected by due process clause are not created by the Constitution; they are created and their dimensions are defined by existing rules or understandings that stem from an independent source such as a statute. U.S.C.A. Const.Amend. 5.

**7. Constitutional Law ⟐277(2)**

If government gives public employee assurances of continued employment or conditions dismissal only for specific reasons, public employee has property interest in continued employment protected by due process clause. U.S.C.A. Const. Amend. 5.

**8. Constitutional Law ⟐277(2)**

If public employee is hired for a limited appointment or is at will, then the employee does not have a property interest in continued employment protected by due process clause. U.S.C.A. Const. Amend. 5.

**9. Constitutional Law ⟐277(2)**

**Officers and Public Employees ⟐69.7**

Federal agency employee had property interest in continued employment protected by due process clause and created by federal statutory employment scheme, inasmuch as employee was civil service employee who could not be dismissed except for cause or unacceptable performance, and was not hired for limited term. U.S.C.A. Const.Amend. 5; 5 U.S.C.A. §§ 4303, 7501, 7513(a).

**10. Constitutional Law ⟐277(2)**

Competitive federal employee who is not serving probationary or trial period under initial appointment, or who has completed one year of current continuous employment in same or similar positions under other than temporary appointment limited to one year or less, has property right in continued employment protected by due process clause. U.S.C.A. Const. Amend. 5; 5 U.S.C.A. § 7501.

**11. Constitutional Law ⟐277(2)**

Public employee's property interest in continued employment is not defined by, or conditioned on, Congress' choice of procedures for its deprivation. U.S.C.A. Const.Amend. 5.

**12. Constitutional Law ⟐278.4(5)**

**Officers and Public Employees ⟐69.7**

Statute providing that agency could take action against employee only for such cause as would promote efficiency of the service, and statute providing that agency could reduce in grade or remove employee for unacceptable performance, did not provide final limit on procedures agency was required by due process clause to follow in removing employee. U.S.C.A. Const. Amend. 5; 5 U.S.C.A. §§ 4303, 7513.

**13. Constitutional Law ⟐277(2), 278.4(1)**

Congress need not confer a property interest in public employment protected by due process clause; however, once it does confer such an interest, it may not remove it without constitutional safeguards. U.S.C.A. Const.Amend. 5.

**14. Constitutional Law ⟐255(1), 278(1.1), 278.4(5)**

Under due process clause, a deprivation of life, liberty, or property must be preceded by notice and opportunity for hearing appropriate to nature of the case; this principle requires some kind of hearing prior to discharge of public employee who has constitutionally protected property interest in his or her employment. U.S.C.A. Const.Amend. 5.

**15. Constitutional Law ⬤278.4(5)**

Under due process clause, pretermination hearing afforded to public employee with property interest in continued employment need not definitively resolve propriety of discharge; it should be initial check against mistaken decisions, essentially a determination of whether there are reasonable grounds to believe that charges against employee are true and support the proposed action.   U.S.C.A. Const.Amend. 5.

**16. Constitutional Law ⬤251.6**

The essential requirements of due process are notice and an opportunity to respond.   U.S.C.A. Const.Amend. 5.

**17. Constitutional Law ⬤251.5**

Opportunity to present reasons, either in person or in writing, why proposed action should not be taken is a fundamental due process requirement.   U.S.C.A. Const. Amend. 5.

**18. Constitutional Law ⬤278.4(5)**

Under due process clause, tenured federal employee facing deprivation of property interest in continued employment is entitled to oral or written notice of charges against him or her, an explanation of employer's evidence, and an opportunity to present his or her side of the story. U.S.C.A. Const.Amend. 5.

**19. Constitutional Law ⬤278.4(5)**

Procedural due process guarantees are not met if public employee facing deprivation of property interest in continued employment has notice only of certain charges or portions of the evidence and the deciding official considers new and material information.   U.S.C.A. Const.Amend. 5.

**20. Constitutional Law ⬤278.4(5)**

Due process clause does not permit deciding official to receive additional material information that may undermine the

objectivity required to protect fairness of process due to public employee facing deprivation of property interest in continued employment.   U.S.C.A. Const.Amend. 5.

**21. Constitutional Law ⬤278.4(5)**

Procedural due process is premised on procedural fairness at each stage of public employee's removal proceedings; employee is entitled to a certain amount of due process rights at each stage and, when these rights are undermined, employee is entitled to relief regardless of the stage of the proceedings.   U.S.C.A. Const.Amend. 5.

**22. Constitutional Law ⬤278.4(5)**

Not every ex parte communication received by deciding official in removal proceedings is a procedural defect so substantial and so likely to cause prejudice that it undermines the due process guarantee and entitles public employee to an entirely new administrative removal proceeding. U.S.C.A. Const.Amend. 5.

**23. Constitutional Law ⬤278.4(5)**

Ex parte communications that introduce new and material information to deciding official in public employee's removal proceeding will violate due process guarantee of notice.   U.S.C.A. Const.Amend. 5.

**24. Officers and Public Employees ⬤72.16(1)**

In deciding whether new and material information has been introduced into removal proceeding by means of ex parte contacts, such that public employee's due process right to notice is violated, Merit Systems Protection Board (MSPB) should consider facts and circumstances of each particular case.   U.S.C.A. Const.Amend. 5.

**25. Officers and Public Employees ⬤72.16(1)**

Among factors useful to Merit Systems Protection Board (MSPB) in deciding

whether new and material information has been introduced into removal proceeding by means of ex parte contacts, such that public employee's due process right to notice is violated, are whether communication merely introduces cumulative information or new information, whether employee knew of error and had chance to respond to it, and whether communications were of the type likely to result in undue pressure upon deciding official to rule in a particular manner. U.S.C.A. Const.Amend. 5.

**26. Officers and Public Employees ⚷72.16(1)**

Ultimately, the inquiry of the Merit Systems Protection Board (MSPB) in deciding whether new and material information has been introduced into removal proceeding by means of ex parte contacts, such that public employee's due process right to notice is violated, is whether the communication is so substantial and so likely to cause prejudice that no employee can fairly be required to be subjected to deprivation of property under such circumstances. U.S.C.A. Const.Amend. 5.

**27. Constitutional Law ⚷278.4(5)**

If Merit Systems Protection Board (MSPB) Board finds that ex parte communication to decisionmaker in removal proceedings has not introduced new and material information, then there is no due process violation; on the other hand, if MSPB finds new and material information has been received by deciding official by means of ex parte communications, then due process violation has occurred and former employee is entitled to new constitutionally correct removal procedure. U.S.C.A. Const.Amend. 5.

**28. Constitutional Law ⚷278.4(5)**

When procedural due process violation has occurred in public employee's removal proceedings because of ex parte communications, such violation is not subject to harmless error test. U.S.C.A. Const.Amend. 5.

**29. Constitutional Law ⚷278.4(5)**

Due process clause only provides the minimum process to which a public employee is entitled prior to removal; public employees are entitled to whatever other procedural protections are afforded them by statute, regulation, or agency procedure which is in addition to protections afforded by Constitution. U.S.C.A. Const.Amend. 5.

———————

Roger A. Jatko, Littleton, Colorado, for petitioner.

Brian S. Smith, Attorney, Commercial Litigation Branch, Civil Division, Department of Justice, Washington, D.C., argued for respondent. With him on the brief were David M. Cohen, Director, and Joseph A. Kijewski.

Before LOURIE, Circuit Judge, SMITH, Senior Circuit Judge, and GAJARSA, Circuit Judge.

GAJARSA, Circuit Judge.

Milton R. Stone seeks review of the final decision of the Merit Systems Protection Board ("Board"), dated September 11, 1997, affirming the April 1, 1997 initial decision of the Administrative Judge ("AJ"), Docket No. DE–0752–97–0279–I–1. The Board sustained Mr. Stone's removal from his position as a bank examiner at the Federal Deposit Insurance Corporation ("FDIC"). For the reasons set forth below, we vacate the decision of the Board and remand for further proceedings consistent with this opinion.

## BACKGROUND

Mr. Stone was employed as a GS–12 bank examiner in the FDIC's Division of

Supervision, Englewood, Colorado. Mr. Stone submitted applications for approved leave using Standard Form 71s on four occasions. He admitted that he signed these forms with the names of doctors who were purportedly excusing the absences that he requested.

The FDIC decided to begin removal proceedings against Mr. Stone for the submission of false requests for leave. The FDIC provided Mr. Stone with notice of the charges of misconduct upon which his removal would be based by letter dated July 22, 1996. The letter stated that Mr. Stone was alleged to have forged four leave slips. The letter explained that Mr. Stone's prior 30–day suspension and a previous letter of reprimand would also be considered. The letter stated that Mr. Stone had "the right to review the material relied on to support this proposed [removal]" and would be "granted a reasonable amount of official time to review the material relied upon to support this [removal], to secure affidavits, and to prepare an answer." The letter also stated that "[f]ull and careful consideration will be given to any reply." Counsel for Mr. Stone requested that the FDIC send him all the materials upon which the FDIC intended to rely in its attempt to discipline Mr. Stone.

The official with the duty to decide whether Mr. Stone had committed such improper acts and to decide the level of the appropriate penalty (the "deciding official") was given instructions by the FDIC outlining his general responsibilities. These instructions included the following:

> Your decision should be based *solely* on the notice of charges and the supporting documentation that is contained in the file, *and not on any additional information . . . .*

> The document file and your deliberations on the case are to be treated as confidential. You are not, however, ex-

pected to decide the matter in isolation. Nevertheless, to prevent due process complications in the case, you are encouraged to confine your discussion about the case as much as possible. Insofar as technical advice is sought or there is a question regarding information contained in the document file, the matter can be discussed with the representative of Labor and Employee Relations Section . . . .

> Prior to making your decision, you may wish to discuss this matter with someone on your senior staff other than the recommending official(s). That person must be given clear instructions about the confidentiality of the matter and the fact that no information other than that which is in the file is to be discussed or considered in connection with the case.

> The matter may be discussed with other individuals (including the recommending officials) *on a limited basis.* Before you do so, you may wish to coordinate with the Labor and Employee Relations Section representative or the Legal Division representative in order to avoid due process problems. In particular, those contacts *must not* involve the introduction of new information about the case.

(No emphasis added.)

After considering Mr. Stone's case, the deciding official recommended removal and Mr. Stone's employment with the FDIC was thereafter terminated under Chapter 75 of Title 5 of the United States Code. After his removal and the filing of his appeal to the Board, Mr. Stone made a second request for relevant documents. In response to this request, Mr. Stone discovered that an *ex parte* memorandum from the official recommending his dismissal (the "proposing official") had been sent to the deciding official. Mr. Stone also discovered that the deciding official

received a second *ex parte* memorandum from another FDIC official urging Mr. Stone's removal. In an affidavit, the deciding official stated that he would have concluded that Mr. Stone should be removed whether or not he had seen the *ex parte* memo from the proposing official.[1]

Mr. Stone appealed the FDIC's decision to the Board, alleging, among other things, that harmful error occurred in the removal proceeding because the deciding official received *ex parte* communications. In response to this argument, the AJ explained:

I find nothing erroneous in that fact [that the proposing official had *ex parte* communications with the deciding official]; indeed, the purpose of a reply is for the appellant to present his side of the case for the agency's consideration. There is no statutory or regulatory prohibition against ex parte communications between the proposing and deciding officials and other officials or persons during the agency's decision-making process. *Andersen v. Department of State*, 27 M.S.P.R. 344, 348 (1985), *aff'd*, 790 F.2d 91 (Fed.Cir.1986) (Table).

The AJ did not apply any type of "harmless error" test with respect to the *ex parte* communications.

On appeal, Mr. Stone argues that the *ex parte* memoranda improperly introduced new, highly prejudicial, and unchallenged charges and information against him. Mr. Stone argues that the introduction of these *ex parte* memoranda was a violation of his right to due process and should automatically void his removal. In the alternative, Mr. Stone urges us to adopt an "objective" harmless error test to determine whether consideration of these *ex parte* memoranda constituted an error that should void the removal proceeding. The objective test would not focus on whether the deciding official actually would have reached the same result if there had been no procedural defect, but rather would focus on whether the error is so likely to have prejudiced the deciding official that the proceeding should be void.

The government argues that *Andersen*'s subjective test for harmless error applies in this case and that Mr. Stone has failed to submit evidence sufficient to meet this test. This subjective test proposed by the government requires the disciplined federal employee to prove the following:

1. that new allegations or information were introduced which the appellant has not had the benefit of reviewing or responding to;

2. that the deciding official *was influenced* by the new allegations or information in his or her decision making process; and

3. that the procedural error of considering the new allegations or information likely had a harmful effect upon the outcome before the agency.

*Andersen*, 27 M.S.P.R. at 349 (emphasis added).

The government argues that the information contained in the *ex parte* memoranda was not "new" and that the deciding official has testified that he would have recommended removal regardless of the *ex parte* communication. The government, therefore, urges us to use a subjective test to find that any procedural error was harmless. The government does not respond to Mr. Stone's constitutional due process arguments.

## DISCUSSION

### A.  Standard of Review

We must affirm the decision of the Board unless it is arbitrary, capricious, an

---

1.  It appears that the second memorandum may have been attached to the proposing official's memorandum. It is unclear from the record before us why the AJ's opinion and the deciding official's affidavit only refer to the proposing official's memorandum and not the other memorandum. In any event, the government does not dispute on appeal that the deciding official received the second *ex parte* memorandum.

abuse of discretion, or otherwise not in accordance with law; obtained without procedures required by law, rule, or regulation having been followed; or unsupported by substantial evidence. *See* 5 U.S.C. § 7703(c) (1994). In this case, we vacate the Board's decision because its analysis of the *ex parte* communications was not in accordance with the requirements of the Due Process Clause of the Fifth Amendment.

### B. Analysis

**[1–5]** Mr. Stone's federal constitutional due process claim depends on his having a property right in continued employment. *See Cleveland Bd. of Educ. v. Loudermill,* 470 U.S. 532, 538, 105 S.Ct. 1487, 84 L.Ed.2d 494 (1985); *Board of Regents v. Roth,* 408 U.S. 564, 576–578, 92 S.Ct. 2701, 33 L.Ed.2d 548 (1972).[2] "The Fourteenth Amendment's procedural protection of property is a safeguard of the security of interests that a person has already acquired in specific benefits." *Roth,* 408 U.S. at 576, 92 S.Ct. 2701. These property interests come in a variety of forms, including public employment. *See id.* If Mr. Stone does possess such a property interest, then the government cannot deprive him of this property without due process. *See Loudermill,* 470 U.S. at 538, 105 S.Ct. 1487.

**[6, 7]** Property interests are not created by the Constitution; "they are created and their dimensions are defined by existing rules or understandings that stem

from an independent source [such as a statute]...." *Roth,* 408 U.S. at 577, 92 S.Ct. 2701. "To have a property interest in a benefit, a person clearly must have more than an abstract need or desire for it. He must have more than a unilateral expectation of it. He must, instead, have a legitimate claim of entitlement to it." *Id.* If the government gives a public employee assurances of continued employment or conditions dismissal only for specific reasons, the public employee has a property interest in continued employment. *See Loudermill,* 470 U.S. at 538, 105 S.Ct. 1487 (finding that Ohio statute providing that public employee was entitled to retain position for good behavior and efficient service and conditioning dismissal on showing of malfeasance or nonfeasance created a property interest in continued employment); *Connell v. Higginbotham,* 403 U.S. 207, 91 S.Ct. 1772, 29 L.Ed.2d 418 (1971) (public teacher hired without tenure or formal contract, but with clearly implied promise of continued employment, had property interest); *Slochower v. Board of Higher Educ.,* 350 U.S. 551, 76 S.Ct. 637, 100 L.Ed. 692 (1956) (public college professor dismissed from office held under tenure provisions had a property interest in continued employment); *Wieman v. Updegraff,* 344 U.S. 183, 73 S.Ct. 215, 97 L.Ed. 216 (1952) (public college professors and staff members dismissed during terms of their contracts had property interests in continued employment); *see also Perry v. Sindermann,* 408 U.S. 593, 92 S.Ct. 2694, 33 L.Ed.2d 570 (1972) (public professor would have protectable interest if college

---

**2.** Although many of the cases in this section discuss the Due Process Clause of the Fourteenth Amendment, the procedural safeguards afforded by the Fourteenth Amendment are no less stringent than those which must be provided under the Due Process Clause of the Fifth Amendment. *See Mathews v. Eldridge,* 424 U.S. 319, 332–335, 96 S.Ct. 893, 47 L.Ed.2d 18 (1976). A Federal agency may not, consistently with the Fifth Amendment Due Process Clause, do that which a State is forbidden to do by the Fourteenth Amend-

ment Due Process Clause. *Cf. Bolling v. Sharpe,* 347 U.S. 497, 500, 74 S.Ct. 693, 98 L.Ed. 884 (1954) (noting that it would be unthinkable for the same Constitution to impose a lesser duty on the Federal government than on state governments); *Hurd v. Hodge,* 334 U.S. 24, 35–36, 68 S.Ct. 847, 92 L.Ed. 1187 (1948) (noting that public policy of the United States cannot manifest a lesser concern for the protection of basic rights than the individual states).

had a de facto tenure program and professor had tenure under this program).

**[8]** On the other hand, if the public employee is hired for a limited appointment or is at will, then the employee does not have a property interest in continued employment. *See Roth*, 408 U.S. at 578, 92 S.Ct. 2701 (where public employee was explicitly appointed for only one year, employee had no property interest in continued employment; employee was not entitled to contract renewal and no statute or policy secured an interest in re-employment); *Bishop v. Wood*, 426 U.S. 341, 346–47, 96 S.Ct. 2074, 48 L.Ed.2d 684 (1976) (statute created at will employment relationship, as interpreted by relevant state courts, and therefore public employee did not have property interest in continued employment).

**[9, 10]** In this case, the federal statutory employment scheme plainly creates a property interest in continued employment. Mr. Stone was a civil service employee who could not be dismissed except for cause or unacceptable performance. *See* 5 U.S.C. § 7513(a) (1994) (agency may take an action against an employee only for such cause as will promote efficiency of the service); 5 U.S.C. § 4303 (1994) (agency may reduce in grade or remove an employee for unacceptable performance). The statute therefore entitled Mr. Stone to continue in his position unless the agency could show he needed to be removed for cause or unacceptable performance. Mr. Stone was not an at will employee or hired for a limited term. As this Court has explained previously, "an employee, as defined by 5 U.S.C. § 7501, has a property right in his continued employment." *King v. Alston*, 75 F.3d 657, 661 (Fed.Cir.1996).[3]

**[11–13]** The next question we face is what process is due Mr. Stone before he can be deprived of his property interest. We begin by noting that his property interest is not defined by, or conditioned on, Congress' choice of procedures for its deprivation. *See Loudermill*, 470 U.S. at 541, 105 S.Ct. 1487. In other words, § 7513 and § 4303 do not provide the final limit on the procedures the agency must follow in removing Mr. Stone. Procedural due process requires "that certain substantive rights—life, liberty, and property—cannot be deprived except pursuant to constitutionally adequate procedures." *Id.* Congress need not confer a property interest in public employment. However, once it does confer such an interest, it may not remove it without constitutional safeguards. *See id.*

**[14–18]** The process due a public employee prior to removal from office has been explained in *Loudermill*. The Supreme Court has stated:

> An essential principle of due process is that a deprivation of life, liberty, or property "be preceded by notice and opportunity for hearing appropriate to the nature of the case." . . . This principle requires "some kind of hearing" prior to the discharge of an employee who has a constitutionally protected property interest in his employment . . . .

> [T]he pretermination hearing need not definitively resolve the propriety of the discharge. It should be an initial check against mistaken decisions—essentially, a determination of whether there are reasonable grounds to believe that the charges against the employee are true and support the proposed action . . . .

> The essential requirements of due process . . . are notice and an opportunity to respond. The opportunity to present reasons, either in person or in writ-

---

**3.** An "employee" is defined under 5 U.S.C. § 7501 as "an individual in the competitive service who is not serving a probationary or trial period under an initial appointment or who has completed 1 year of current continuous employment in the same or similar positions under other than a temporary appointment limited to 1 year or less."

ing, why proposed action should not be taken is a fundamental due process requirement. . . . *The tenured employee is entitled to oral or written notice of the charges against him, an explanation of the employer's evidence, and an opportunity to present his side of the story* . . . . To require more than this prior to termination would intrude to an unwarranted extent on the government's interest in quickly removing an unsatisfactory employee.

*Id.* at 542–46, 105 S.Ct. 1487 (emphasis added). The Supreme Court expressly noted that the need for a meaningful opportunity for the public employee to present his or her side of the case is important in enabling the agency to reach an accurate result for two reasons. First, dismissals for cause will often involve factual disputes and consideration of the employee's response may help clarify such disputes. In addition, even if the facts are clear, "the appropriateness or necessity of the discharge may not be; in such cases, the only meaningful opportunity to invoke the discretion of the decisionmaker is likely to be before the termination takes effect." *Id.* at 543, 105 S.Ct. 1487.

Thus, the Supreme Court expressly recognized that the employee's response is essential not only to the issue of whether the allegations are true, but also with regard to whether the level of penalty to be imposed is appropriate. Even the leading Board decision regarding the evaluation of the appropriateness of disciplinary penalties explains that

aggravating factors on which the agency intends to rely for imposition of an enhanced penalty, *such as a prior disci-*

*plinary record*, should be included in the *advance notice of charges so that the employee will have a fair opportunity to respond* to those alleged factors before the agency's deciding official, and the decision notice should explain what weight was given to those factors in reaching the agency's final decision.

*Douglas v. Veterans Admin.*, 5 MSPB 313, 5 M.S.P.R. 280, 304 (1981) (emphasis added).

**[19–21]** The introduction of new and material information by means of *ex parte* communications to the deciding official undermines the public employee's constitutional due process guarantee of notice (both of the charges and of the employer's evidence) and the opportunity to respond. When deciding officials receive such *ex parte* communications, employees are no longer on notice of the reasons for their dismissal and/or the evidence relied upon by the agency. Procedural due process guarantees are not met if the employee has notice only of certain charges or portions of the evidence and the deciding official considers new and material information.[4] It is constitutionally impermissible to allow a deciding official to receive additional material information that may undermine the objectivity required to protect the fairness of the process. Our system is premised on the procedural fairness at each stage of the removal proceedings. An employee is entitled to a certain amount of due process rights at each stage and, when these rights are undermined, the employee is entitled to relief regardless of the stage of the proceedings.

**[22–26]** However, not every *ex parte* communication is a procedural defect so

---

4.  Our analysis is not in conflict with our prior cases, *Depte v. United States*, 715 F.2d 1481 (Fed.Cir.1983) and *Grover v. United States*, 200 Ct.Cl. 337 (1973). Those two cases contained language to the effect that pre-hearing *ex parte* communications were permissible. *See Depte*, 715 F.2d at 1484 and *Grover*, 200 Ct.Cl. at 350. Those cases, however, were

decided prior to the Supreme Court's decision in *Loudermill*, which delineated an employee's due process rights with respect to pre-hearing terminations. To the extent *Depte* and *Grover* are inconsistent with *Loudermill*, they can no longer serve as binding precedent.

substantial and so likely to cause prejudice that it undermines the due process guarantee and entitles the claimant to an entirely new administrative proceeding. Only *ex parte* communications that introduce new and material information to the deciding official will violate the due process guarantee of notice. In deciding whether new and material information has been introduced by means of *ex parte* contacts, the Board should consider the facts and circumstances of each particular case. Among the factors that will be useful for the Board to weigh are: whether the *ex parte* communication merely introduces "cumulative" information or new information; whether the employee knew of the error and had a chance to respond to it; and whether the *ex parte* communications were of the type likely to result in undue pressure upon the deciding official to rule in a particular manner. Ultimately, the inquiry of the Board is whether the *ex parte* communication is so substantial and so likely to cause prejudice that no employee can fairly be required to be subjected to a deprivation of property under such circumstances.

[27, 28] If the Board finds that an *ex parte* communication has not introduced new and material information, then there is no due process violation. On the other hand, if the Board finds new and material information has been received by the deciding official by means of *ex parte* communications, then a due process violation has occurred and the former employee is entitled to a new constitutionally correct removal procedure. As we have explained previously, when a procedural due process violation has occurred because of *ex parte* communications, such a violation is not subject to the harmless error test. *See Sullivan v. Department of the Navy*, 720 F.2d 1266, 1274 (Fed.Cir.1983); *Ryder v. United States*, 218 Ct.Cl. 289, 585 F.2d 482, 488 (1978) (refusing to apply harmless error test: "[W]here a serious procedural curtailment mars an adverse personnel action which deprives the employee of pay, the court has regularly taken the position that the defect divests the removal (or demotion) of legality, leaving the employee on the rolls of the employing agency and entitled to his pay until proper procedural steps are taken toward removing or disciplining him. In that situation, the merits of the adverse action are wholly disregarded."); *Camero v. United States*, 179 Ct.Cl. 520, 375 F.2d 777, 780 (1967).

In this case, because Mr. Stone had a property interest in continued employment with the FDIC, he was entitled by the Due Process Clause to meaningful notice of the reasons for his removal and a meaningful opportunity to respond. Because of the *ex parte* contacts between FDIC officials and the deciding official, Mr. Stone's procedural due process rights may have been undermined. *See Sullivan*, 720 F.2d at 1274 (finding that *ex parte* contacts were not only unfair, but a denial of rights under due process clause of the Constitution). We therefore must remand this case to the Board to determine, in the first instance, whether the *ex parte* communications in this case undermined Mr. Stone's procedural due process right to meaningful notice and an opportunity to respond. Specifically, the Board must analyze whether the *ex parte* communications in this case introduced new and material information to the deciding official. If the Board finds the communications did introduce such new and material information, Mr. Stone should be afforded a constitutionally correct removal procedure.

[29] In closing, we make two final observations. First, we express no opinion as to whether the *ex parte* communications in this case constituted new and material information that undermined Mr. Stone's procedural due process rights. Second, we note that the Due Process Clause only provides the minimum process

**1378** 179 FEDERAL REPORTER, 3d SERIES

to which a public employee is entitled prior to removal. Public employees are, of course, entitled to whatever other procedural protections are afforded them by statute, regulation, or agency procedure which is in addition to the protections afforded by the Constitution.

## CONCLUSION

We therefore vacate the Board's decision and remand the case for proceedings consistent with this opinion.

*VACATED* AND *REMANDED*.

## COSTS

Each party to bear its own costs.



**Trinidad G. BUSTOS, Claimant–
Appellant,**

**v.**

**Togo D. WEST, Jr., Secretary of
Veterans Affairs, Respondent–
Appellee.**

**No. 98–7069.**

United States Court of Appeals,
Federal Circuit.

June 16, 1999.

Veteran challenged prior rating decision in which he was granted noncompens-able rating for service connection for post-traumatic stress disorder (PTSD) but denied service connection for alcohol and substance abuse, contending that decision was based on clear and unmistakable error (CUE). The Board of Veterans' Appeals denied claim. Veteran appealed. The United States Court of Veterans Appeals, Donald L. Ivers, J., 1998 WL 199803, affirmed. Veteran appealed. The Court of Appeals, Gajarsa, Circuit Judge, held that, to prove existence of CUE as set forth in regulation permitting prior final decision to be re-opened when there is CUE, claimant must show that outcome-determinative error occurred.

Affirmed.

**Armed Services �kö 132**

To prove existence of clear and unmistakable error (CUE) as set forth in regulation permitting prior final regional office decision to be re-opened when there is CUE, claimant must show that outcome-determinative error occurred, that is, an error that would manifestly change outcome of prior decision. 38 U.S.C.A. §§ 5109A, 7292(d); 38 C.F.R. §§ 3.104(a), 3.105(a).

———

Kenneth M. Carpenter, Carpenter, Chartered, Topeka, Kansas, argued, for claimant-appellant.

Domenique Kirchner, Attorney, Commercial Litigation Branch, Civil Division, Department of Justice, of Washington, DC, argued, for respondent-appellee. With her on the brief were David M. Cohen, Director, and Jeanne E. Davidson, Deputy Director. Of counsel on the brief were Richard J. Hipolit, Deputy Assistant General Counsel, and Kerwin E. Miller, Staff Attorney, Department of Veterans Affairs, Washington, DC.

Before NEWMAN, SCHALL, and GAJARSA, Circuit Judges.